**CASE NO. 25-2003**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION

*Appellant.*

v.

JIMMORI ROBINSON; JEFFREY WEIMER; TYE EDWARDS; JUSTIN
HARRINGTON

*Appellees,*

ON APPEAL FROM UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA
1:25-CV-00075-JPB

**OPENING BRIEF OF APPELLANT**

HOLLAND & KNIGHT LLP

Thomas Woodrow
Nishma Patel
1120 S. Tryon Street, Suite 900

Charlotte, North Carolina 28203
980-215-7797
tom.woodrow@hklaw.com
nishma.patel@hklaw.com

J. Douglas Minor, Jr.
1180 West Peachtree Street, Suite 1800
Atlanta, Georgia 30309
(404) 817-8500
doug.minor@hklaw.com

*Attorneys for Appellant-Defendant, National Collegiate Athletic Association*

# <u>CORPORATE DISCLOSURE STATEMENT</u>

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. <u>25-2003</u>     Caption: <u>National Collegiate Athletic Associate v. Robinson, et al.</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>National Collegiate Athletic Associate</u>
(name of party/amicus)

who is <u>Appellant,</u> makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? <u>NO</u>

2. Does party/amicus have any parent corporations? <u>NO</u>
   NO If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? <u>NO</u>
   If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? <u>NO</u>
   NO If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) <u>NO</u>

6. Does this case arise out of a bankruptcy proceeding? <u>NO</u>
   NO If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? <u>NO</u>
   If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.


Signature: <u>  /s/ Nishma Patel    </u>          Date: <u> October 27, 2025</u>

Counsel for: <u>  Appellant</u>

ii

# <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ....................................................................................1

JURISDICTIONAL STATEMENT ........................................................4

STATEMENT OF ISSUES PRESENTED................................................4

   **I.**   Did the District Court Err in Finding that Appellees Established a Likelihood of Success on the Merits of Their Antitrust Claim? **Yes.** .........4

      **A.**   Did the District Court err by disregarding precedent and finding that the Five-Year Rule is subject to the Sherman Act? **Yes.**..........................5

      **B.**   Did the District Court fail to make legally sufficient findings as to the relevant antitrust market? **Yes.** ...........................................................5

      **C.**   Did the District Court commit clear error by finding that the Five-Year Rule has anticompetitive effects based solely on the expert's report matter and testimony from another, which themselves cited no supporting evidence? **Yes.** .........................................................5

      **D.**   Did the District Court commit clear error by disregarding the NCAA's procompetitive justifications for the Five-Year Rule? **Yes.**.......5

  **II.**   Did the District Court commit clear error in finding that Appellees established a likelihood of irreparable harm and that the equities favored a preliminary injunction? **Yes.**........................................................5

STATEMENT OF RELATED CASES.......................................................5

STATEMENT OF THE CASE.................................................................6

   **I.**   **The NCAA and the Five-Year Rule.** ......................................6

  **II.**   **Appellees Played Four Seasons Across Five Eligible Years.**................8

      **A.**   **Jimmori Robinson**...................................................................8

      **B.**   **Jeffrey Weimer**......................................................................9

      **C.**   **Tye Edwards**........................................................................10

      **D.**   **Justin Harrington** ................................................................11

  **III.**   **Alleged Impact of *Pavia* on Appellees.** .................................12

  **IV.**   **The Preliminary Injunction Hearing.** ...................................14

  **V.**   **The District Court Granted the Preliminary Injunction.** ...................17

SUMMARY OF ARGUMENT ...................................................................19

LEGAL STANDARD AND STANDARD OF REVIEW ......................................21

ARGUMENT ....................................................................................22

   **I.**    **The District Court Erred by Finding that Appellees Showed a Likelihood of Success on the Merits of Their Antitrust Claim.**............22

      **A.**    **Circuit Court Precedent Makes Clear that Eligibility Rules are Non-Commercial and Thus Not Subject to Antitrust Scrutiny.** ......24

      **B.**    **The District Court Failed to Define a Relevant Market Based in Reason and Economic Analysis.** ..........................................27

      **C.**    **The District Court Erred in Finding that the Five-Year Rule Has Anticompetitive Effects.** ...............................................32

      **D.**    **The District Court Erred in Rejecting the NCAA's Procompetitive Justifications.** ...............................................42

   **II.**    **The District Court Erred in Finding Irreparable Harm.**....................44

   **III.**    **The Balance of the Equities in favor of Appellees.** ...............................51

   CONCLUSION ..............................................................................53

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adidas Am., Inc. v. NCAA*,
    40 F. Supp. 2d 1275 (D. Kan. 1999)...................................................25

*Agnew v. NCAA*,
    683 F.3d 328 (7th Cir. 2012) ............................................................33

*Alston v. NCAA*
    594 U.S. at 74, 141 S.Ct. 2141 ..................................................*passim*

*Am. Air Filter Co. v. Price*,
    2017 NCBC LEXIS 9 (N.C. Super. Ct. Feb. 3, 2017)........................47

*Am. Bd. of Opticianry & Nat'l Contact Lens Examiners, Inc. v. Inst.*
    *For Credentialing Excellence*,
    No. 1:15-cv-1169, 2016 WL 11668712 (E.D. Va. Mar. 4, 2016).....................23

*Am. Motor Inns, Inc. v. Holiday Inns, Inc.*,
    521 F.2d 1230 (3d Cir. 1975) ...........................................................28

*Arbolida v. NCAA*,
    No. 25-2079-JWB, 2025 WL 579830 (D. Kan. Feb. 21, 2025)
    ......................................................................................................*passim*

*Atlantic Richfield Co. v. USA Petroleum Co.*,
    495 U.S. 328 (1990).........................................................................34

*Bassett v. NCAA*,
    528 F.3d 426 (6th Cir. 2008) .....................................................23, 24

*Bellamy v. Nat'l Collegiate Athletic Ass'n,*
    No. 3:25-CV-00750, 2025 WL 2267761 (M.D. Tenn. Aug. 7,
    2025) ...............................................................................................46

*Bewley v. NCAA*,
    No. 23 CV 15570, 2024 WL 113971 (N.D. Ill. Jan. 10, 2024) .........33

*Boyd v. Nat'l Collegiate Athletic Ass'n*,
No. 3:25-CV-00729, 2025 WL 2432200 (M.D. Tenn. Aug. 22,
2025) ................................................................................*passim*

*Braham v. NCAA*,
2025 WL 2017162 (D. Nev. July 18, 2025) ...............................2, 5, 18

*Broadcom Corp. v. Qualcomm Inc.*,
501 F.3d 297, 307 (3d Cir. 2007) ...............................................28

*Brown Shoe Co. v. United States*,
370 U.S (1962) ................................................................................34

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977) ......................................................................35

*Brzovic v. NCAA*,
No. 2:25-cv-02885-DCN, 2025 WL 1370758 (D.S.C. May 11,
2025) ..............................................................................................6

*Centro Tepeyac v. Montgomery Cnty.*,
722 F.3d 184, 188 (4th Cir. 2013) ...............................................22

*Ciulla-Hall v. NCAA*,
No. 25-cv-10271-DJC, 2025 WL 438707 (D. Mass. Feb. 7, 2025) .........5, 44, 46

*Coley v. NCAA*,
No. 5:25-cv-00098-D-BM, 2025 WL 1616719 (E.D.N.C. June 6,
2025) ................................................................................*passim*

*Continental Airlines, Inc. v. United Airlines, Inc.*,
277 F.3d 499 (4th Cir. 2002) .......................................................35

*Deesen v. Pro. Golfers' Ass'n*,
358 F.2d 165, 172 (9th Cir. 1966) ...............................................38, 39

*Di Biase v. SPX Corp.*,
872 F.3d 224, 229 (4th Cir. 2017) ...............................................22

*Direx Israel, Ltd. v. Breakthrough Med. Corp.*,
952 F.2d 802 (4th Cir.1991) .........................................................20

*dmarcian, Inc. v. dmarcian Eur. BV*, 60 F.4th 119, 138 (4th Cir. 2023) ................21

*Dziewa v. Pennsylvania Interscholastic Athletic Ass'n, Inc.*,
No. CIV.A. 08-5792, 2009 WL 113419 (E.D. Pa. Jan. 16, 2009) ....................50

*Elad v. NCAA*,
2025 WL 1202014 (D.N.J. Apr. 25, 2025)....................................................*passim*

*Fourqurean v. Nat'l Collegiate Athletic Ass'n*,
143 F.4th 859 (7th Cir. 2025) ........................................................13, 29

*Fourqurean v. NCAA*,
No. 25-cv-68-wmc, 2025 WL 993975 (W.D. Wis. Feb. 6, 2025)................4, 28

*Frazier v. Prince George's Cnty., Maryland*,
86 F.4th 537, 543 (4th Cir. 2023) ........................................................22

*Gaines v. NCAA*,
746 F. Supp. 738 (M.D. Tenn. 1990)........................................................24

*Giles v. NCAA*,
No. 8:25-cv-01488-JVS-KES, ECF No. 13, at 2 (C.D. Cal. July 17,
2025) ........................................................................................45

*Goldstein v. NCAA*,
3:25-cv-27, 2025 WL 662809 (M.D. Ga., Feb. 28, 2025)
........................................................................5, 24, 27

*Hausknecht v. John Hancock Life Ins. Co. of N.Y.*,
614 F. Supp. 3d 168 (E.D. Pa. 2022)........................................................31

*Johnson v. Nat'l Collegiate Athletic Ass'n*, 2025 WL 1790345 (D.
Mont. June 26, 2025) ........................................................................4, 8

*Jones et al. v. Nat'l Collegiate Athletic Ass'n.*
2025CVS3492 (N.C. Sup. Ct. 2025) ........................................................46, 48

*Jones v. NCAA*,
392 F. Supp. 295 (D. Mass. 1975)........................................................25

*Kupec v. Atl. Coast Conference*,
399 F. Supp. 1377 (M.D.N.C. 1975) ........................................................49

*Mahmoud v. McKnight*,
102 F.4th 191 (4th Cir. 2024) ........................................................22

*McCormack v. NCAA*,
  845 F.2d 1338 (5th Cir. 1988) .................................................................33

*McGee v. Virginia High Sch. League, Inc.*,
  801 F. Supp. 2d 526 (W.D. Va. 2011) ....................................................50

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by
  Sandra Townes Powell*,
  915 F.3d 197 (4th Cir. 2019) ...................................................................49

*Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*,
  838 F.3d 421 (3d Cir. 2016) .....................................................................28

*N. Iredell Neighbors for Rural Life v. Iredell Cnty.*,
  196 N.C. App. 68 (2009) ...........................................................................47

*Henderson ex rel. NLRB v. Bluefield Hosp. Co.*,
  902 F.3d 432 (4th Cir. 2018) ...................................................................21

*NCAA v. Bd. of Regents of Univ. of Oklahoma*,
  468 U.S. 85 (1984) ...............................................................................4, 8

*Northern Va. Hemp v. Virginia*,
  700 F. Supp. 3d. 407 (E.D. Va. 2023), vacated on other grounds,
  125 F.4th 472 (4th Cir. 2025) ..................................................................45

*O'Bannon v. NCAA*,
  802 F.3d 1049 (9th Cir. 2015) ..........................................................*passim*

*Ohio v. Am. Express Co.*,
  585 U.S. 529 (2018)...........................................................................*passim*

*Osuna Sanchez v. NCAA*,
  No. 3:25-cv-62-CEA-DCP, 2025 WL 684271 (E.D. Tenn. Mar. 3,
  2025) ...................................................................................................6, 27

*Pashby v. Delia*,
  709 F.3d 307 (4th Cir. 2013) ...................................................................21

*Pavia v. NCAA*,
  760 F. Supp. 3d 527 (M.D. Tenn. 2024) ....................................2, 6, 12, 46

*Pavia v. NCAA*,
    No. 24-6153, 2025 WL 2787816 (6th Cir. 2025)......................................*passim*

*Pierce v. N.C. State Bd. of Elections*,
    97 F.4th 194 (4th Cir. 2024) ...............................................................21

*PNC Bank, Nat'l Ass'n v. 2013 Travis Oak Creek, L.P.*,
    136 F.4th 568 (5th Cir. 2025) .............................................................31

*Potomatc Heritage Trail Ass'n, Inc. v. U.S. Dep't of Transp.*,
    Civ. No. DLB-22-2482, 2022 WL 7051160 (D. Md. Oct. 11, 2022)................45

*Roe v. Dep't of Def.*,
    947 F.3d 207 (4th Cir. 2020) ..............................................................21

*Sharon City Sch. Dist. v. PIAA*,
    No. CIV.A. 9-213, 2009 WL 427373 (W.D. Pa. Feb. 20, 2009).......................50

*Smith v. NCAA*,
    139 F.3d 180 (3d Cir. 1998) .............................................................*passim*

*Smith et. al v. Nat'l Collegiate Athletic Ass'n*,
    2025 NCBC 24 (N.C. Sup. Ct. 2025) ..................................................47

*Southtech Orthopedics, Inc. v. Dingus*,
    428 F. Supp. 2d 410 (E.D.N.C. 2006) .........................................44, 45

*Taylor v. Freeman*,
    34 F.3d 266 (4th Cir. 1994) ...............................................................21

*TK Elevator Corp. v. Drzewiecki*,
    No. CV RDB-25-0744, 2025 WL 776111 (D. Md. Mar. 11, 2025)..................45

*Toscano v. PGA Tour, Inc.*,
    201 F. Supp. 2d 1106, 1122-23 (E.D. Cal. 2002) ..............................39

*United States v. Brown Univ.*,
    5 F.3d 658 (3d Cir. 1993) ..................................................................22

*Virginia Vermiculite, Ltd. v. W.R. Grace & Co*,
    156 F.3d 535 (4th Cir. 1998) .............................................................23

*W&W Partners, Inc. v. Ferrell Land Co.*,
2018 NCBC LEXIS 210 (N.C. Super. Ct. Mar. 8, 2018) ................................... 47

*Wade v. NCAA*,
No. 2:24-cv-196-TBM-RPM, 2024 WL 5212665 (S.D. Miss. Dec. 23, 2024) ....................................................................................................... 5

*Waff Bros, Inc. v. Bank of N. Carolina*,
N.A., 289 N.C. 198, 204 (1976) ......................................................................... 45

*Walker v. NCAA*,
2025 WL 1901907 (M.D. La. July 1, 2025) ....................................................... 46

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ................................................................................................ 21

*Worldwide Basketball & Sport Tours, Inc. v. NCAA*,
388 F.3d 955, 959 (6th Cir. 2004)) ............................................................ 23, 28

*Wyndham Vacation Ownership, Inc. v. Montgomery L. Firm, LLC*,
No. 8:19-CV-1895-CEH-CPT, 2021 WL 4948151 (M.D. Fla. Oct. 18, 2021) ........................................................................................................... 35

*Zeigler v. NCAA*,
No. 3:25-cv-226-KAC-JEM, 2025 WL 1671952 (E.D. Tenn. June 12, 2025) ................................................................................................... *passim*

## Statutes

28 U.S.C. § 1292(a)(1) .......................................................................................... 4

28 U.S.C. § 1331 ..................................................................................................... 4

28 U.S.C. § 1367 ..................................................................................................... 4

Sherman Act § 1 ................................................................................................... 22

Sherman Act § 2 ................................................................................................... 25

## Other Authorities

11A Charles A. Wright, Arthur R. Miller, et al., Federal Practice and Procedure § 2948.1 (3d ed. 2018) ............................................................... 48

Federal Rule of Appellate Procedure 4(a)(1)(A) ......................................................4

Federal Rule of Evidence 702 ...........................................................................30, 31

Federal Rule of Evidence 703 ...................................................................................31

## **INTRODUCTION**

This appeal concerns longstanding eligibility rules established by hundreds of Division I colleges and universities across the country. These institutions, acting through the National Collegiate Athletic Association ("NCAA"), have developed eligibility criteria, including required minimum grade point averages, progress toward degree requirements, and limitations on the duration of participation in athletic competition, that preserve the unique character of collegiate sports and maintain a tie between college sports and a college education. These rules ensure that opportunities to play collegiate sports are available to student-athletes pursuing college degrees, pursuant to uniform criteria applicable to all Division I schools.

The eligibility rules include a provision that limits student-athletes to participation in four seasons of collegiate competition across five years, tracking the period of time a student would be expected to be actively pursuing a degree ( "Five-Year Rule"). This provision ensures that student-athletes who have been afforded five years to excel in athletics and academics make way for the next group of student-athletes as they move on to the next phase of their lives.

Appellees in this matter have exhausted their eligibility under the Five-Year Rule. They began their football careers at two-year junior colleges ("JUCOs") before moving on to an NCAA member institution and continuing their collegiate careers. After exhausting their eligibility prior to transferring to West Virginia University

("WVU"), Appellees filed suit in an effort to extend their football careers. Appellees sought injunctive relief under the Sherman Act, alleging the Five-Year Rule's inclusion of their JUCO participation violates antitrust law.

The District Court granted a mandatory preliminary injunction, ordering the NCAA to give Appellees a waiver of the Five-Year Rule for the 2025-26 season. In doing so, the District Court erred. The District Court disregarded caselaw recognizing that the NCAA's eligibility rules are outside the purview of the Sherman Act. Instead, the District Court adopted rulings by other district courts, two of which are currently on appeal and against the greater weight of decisions in similar cases. *See Elad v. NCAA*, 2025 WL 1202014 (D.N.J. Apr. 25, 2025); *Braham v. NCAA*, 2025 WL 2017162 (D. Nev. July 18, 2025).[1] Additionally, the District Court erred in its analysis of Appellees' likelihood of success under the Sherman Act's rule of reason.

First, the District Court failed to make any findings regarding the relevant antitrust market—an essential prerequisite under the rule of reason. In lieu of requiring evidence of a relevant market, the District Court determined that it could accept the relevant market findings in preliminary rulings by other district courts. This was improper. The "findings" relied upon statements in *Alston*, a Supreme

---

[1] The District Court also relied on *Pavia v. NCAA*, 760 F. Supp. 3d 527 (M.D. Tenn. 2024). On October 1, 2025 the Sixth Circuit Court of Appeals determined that the NCAA's appeal was moot as a result of the waiver issued shortly after his request for injunctive relief was granted. No. 24-6153 (6th Cir. 2025). The *Elad* matter is fully briefed and argued on appeal; in the *Braham* matter, the reply brief is due on October 27, 2025.

Court decision involving a different set of rules and an uncontested market definition,[2] but *Alston* held that a market definition is a very fact-specific inquiry which necessitates an individual assessment of each case.[3] Appellees cannot circumvent the need for a fact-specific assessment of the market definition relevant to *this* matter by relying on those in other cases.

Second, the District Court erred in determining that the Five-Year Rule is anticompetitive. The court relied on the "intuition" of an expert who submitted a report in *Elad* despite the absence of any data or economic analysis in his report. Of note, the report submitted here was that which an expert produced for another matter with different facts and was not the product of an assessment conducted for this matter.

Third, the District Court improperly rejected the NCAA's procompetitive justifications for the Five-Year Rule. The NCAA explained that eligibility rules preserve college athletics as a unique offering from professional sports. (JA1130); USA *Zeigler* Amicus at 9 ("It takes no great leap of logic to see how rules tying eligibility to education-related requirements" could "preserve the unique nature of [the NCAA's] product.")[4].

---

[2] *Alston*, 594 U.S. at 86; *Fourqurean v. NCAA*, 143 F.4th at 870 ("The *Alston* Court did not decide the question of market definition.").

[3] Alston itself notes that the rule of reason "analysis generally requires a court to 'conduct a fact-specific assessment of market power and market structure' to assess a challenged restraint's 'actual effect on competition.'" 594 U.S. at 81 (quotations omitted).

[4] Most—if not all—eligibility rules fall within the presumption of procompetitiveness afforded to certain NCAA regulations because those regulations in college sports are necessary for the product to exist. *See Alston*, 594 U.S. at

Finally, the District Court erred in determining Appellees' had proven irreparable harm in the absence of an injunction. Appellant adduced uncontroverted evidence that Appellees—who began their collegiate careers in 2018 and 2019—filed suit several months after the conclusion of the 2024 season. Appellees' months, if not years, of self-created delay in seeking "emergency" relief from the judicial system weighs heavily against the issuance of injective relief.

## JURISDICTIONAL STATEMENT

Pursuant to 28 U.S.C. §§ 1331 and 1367, the District Court had subject matter jurisdiction over this case because Appellees allege violations of the Sherman Act. Pursuant to 28 U.S.C. § 1292(a)(1), this Court has jurisdiction because this is an appeal from an order granting a preliminary injunction. Pursuant to Federal Rule of Appellate Procedure 4(a)(1)(A), this appeal is timely because it was filed on August 25, 2025, which is within thirty days after the District Court issued its August 20, 2025 preliminary injunction.

## STATEMENT OF ISSUES PRESENTED

**I.**    Did the District Court Err in Finding that Appellees Established a Likelihood of Success on the Merits of Their Antitrust Claim? **Yes.**

---

87-88; *Board of Regents*, 468 U.S. at 101; Johnson, 2025 WL 1790345, at *14 ("While the availability of NIL compensation has without question changed the landscape of college athletics, those changes …do[es] not mean that there is no procompetitive rationale for the NCAA's eligibility rules."); *Boyd*, 2025 WL 2432200, at *7 (endorsing the NCAA's procompetitive rationales of enhancing output by creating opportunities for "high school senior student-athletes," preserving college sports "as a product distinct from professional athletics," and fostering "better alignment between Division I athletics and academics").

**A.** Did the District Court err by disregarding precedent and finding that the Five-Year Rule is subject to the Sherman Act? **Yes.**

**B.** Did the District Court fail to make legally sufficient findings as to the relevant antitrust market? **Yes.**

**C.** Did the District Court commit clear error by finding that the Five-Year Rule has anticompetitive effects based solely on the expert's report matter and testimony from another, which themselves cited no supporting evidence? **Yes.**

**D.** Did the District Court commit clear error by disregarding the NCAA's procompetitive justifications for the Five-Year Rule? **Yes.**

**II.** Did the District Court commit clear error in finding that Appellees established a likelihood of irreparable harm and that the equities favored a preliminary injunction? **Yes.**

## STATEMENT OF RELATED CASES

This appeal presents issues related to *Pavia v. NCAA*, No. 24-6153, which was determined to be moot by the Court of Appeals for the Sixth Circuit and *Fourqurean v. NCAA*, No. 25-187, where entry of a preliminary injunction similar to the one here was reversed on appeal by the Court of Appeals for the Seventh Circuit, as well as *Elad v. NCAA*, 2025 WL 1202014 (D.N.J. Apr. 25, 2025), and *Braham v. NCAA*, 2025 WL 2017162 (D.Nev. July 18, 2025), which are on appeal in their respective circuits.

This appeal also presents issues related to *Wade v. NCAA,* No. 2:24-cv-196-TBM-RPM, 2024 WL 5212665 (S.D. Miss. Dec. 23, 2024), *Ciulla-Hall v. NCAA,* No. 25-cv-10271-DJC, 2025 WL 438707 (D. Mass. Feb. 7, 2025), *Arbolida v. NCAA*, No. 25-2079-JWB, 2025 WL 579830 (D. Kan. Feb. 21, 2025), *Goldstein v.*

*NCAA*, 3:25-cv-27, 2025 WL 662809 (M.D. Ga., Feb. 28, 2025), *Osuna Sanchez v. NCAA*, No. 3:25-cv-62-CEA-DCP, 2025 WL 684271 (E.D. Tenn. Mar. 3, 2025), *Brzovic v. NCAA*, No. 2:25-cv-02885-DCN, 2025 WL 1370758 (D.S.C. May 11, 2025), *Coley v. NCAA*, No. 5:25-cv-00098-D-BM, 2025 WL 1616719 (E.D.N.C. June 6, 2025), *Zeigler v. NCAA*, No. 3:25-cv-226-KAC-JEM, 2025 WL 1671952 (E.D. Tenn. June 12, 2025), *Pavia v. NCAA*, 760 F. Supp. 3d 527 (M.D. Tenn. 2024), *Fourqurean v. NCAA*, No. 25-cv-68-wmc, 2025 WL 993975 (W.D. Wis. Feb. 6, 2025), *Elad v. NCAA,* No. CV 25-1981 (ZNQ) (JTQ), 2025 WL 1202014 (D.N.J. Apr. 25, 2025). Of note, the vast majority of these cases have been decided in favor of the NCAA.[5]

## STATEMENT OF THE CASE

### I. The NCAA and the Five-Year Rule.

The NCAA's mission is to "[p]rovide a world-class athletics and academic experience for student-athletes that fosters lifelong well-being." (JA82.) "The membership of the NCAA encompasses public and private institutions and conferences of widely varying mission, size, resources and opportunities. Accordingly, Association-wide governance must reflect these differences through

---

[5] To date, only five federal district courts have granted injunctions, including this case and one other in the district from which this appeal is taken. The NCAA is appealing each of those decisions. The only appellate court to address one of the appeals on the merits has sided with the NCAA. *See Fourqurean v. NCAA*, 143 F.4th 859, 863 (7th Cir. 2025). Further, one of the districts that initially granted injunctive relief in one case, changed course in a second case and denied injunctive relief on the merits. *See Boyd v. NCAA*, No. 3:25-cv-729, 2025 WL 2432200 (M.D. Tenn. Aug. 22, 2025).

the delegation of authorities and responsibilities to the divisions, conferences and individual member institutions….” (JA84.)

NCAA athletics are divided into Divisions I, II, and III. (JA78.) Division I member schools have adopted various rules that govern student-athletes' eligibility for Division I competition. (*See* JA70-512.)

Two NCAA Bylaws are at issue here. First, "the Five-Year Rule" provides that "[a] student-athlete shall complete the student-athlete's seasons of participation within five calendar years from the beginning of the semester or quarter in which the student-athlete first registered for a minimum full-time program of studies in a collegiate institution," with certain exceptions, such as time spent in the armed services. Second, the bylaws define a "collegiate institution" as one that is accredited at the college level by the Department of Education and authorized to offer at minimum a one-year program of study, one that conducts an intercollegiate athletics program regardless of accreditation, or one that is located outside the United States. (JA135; JA221.) Accordingly, under these rules, student-athletes cannot participate in more than four seasons of intercollegiate competition, whether at JUCOs or NCAA schools, in any one sport; and they also have five years to complete those four seasons.

The NCAA's eligibility rules, including those challenged here, help define the nature of the NCAA Division I football and differentiate it from professional sports,

such as the NFL. (JA648-650.) They also ensure that new students get opportunities that would otherwise be filled by more senior players.[6]

## II. Appellees Played Four Seasons Across Five Eligible Years.

### A. Jimmori Robinson

Robinson started his collegiate football career in 2019 at Dodge City Community College, a JUCO. (JA8.) The following year, Robinson transferred to Monroe University, another JUCO, for the 2020-2021 academic year. While at Monroe University, the football season was cancelled due to COVID-19. (JA8.) In 2021, Robinson transferred to the University of Texas at San Antonio ("UTSA"), a Division I institution, where he competed in the following football seasons: 2021-2022 (redshirt); 2022-2023; 2023-2024; and 2024-2025. (JA1107.)

At this point, Robinson had exhausted his eligibility clock (both the four seasons of competition and five years of eligibility). (JA534, JA680.) Despite this, in 2025, Robinson transferred to West Virginia University ("WVU"), where he erroneously believed he would be granted a waiver for his years at a JUCO based on the *Pavia* waiver, *see infra* Sec. III, and, thus, withdrew from the NFL draft. (JA1107, JA1108.) While at WVU, Robinson sought a waiver to compete in the

---

[6] *Alston*, 594 U.S. at 87-88; *Board of Regents*, 468 U.S. at 101; Johnson, 2025 WL 1790345, at *14 ("While the availability of NIL compensation has without question changed the landscape of college athletics, those changes …do not mean that there is no procompetitive rationale for the NCAA's eligibility rules."); *Boyd*, 2025 WL 2432200, at *7 (endorsing the NCAA's procompetitive rationales of enhancing output by creating opportunities for "high school senior student-athletes," preserving college sports "as a product distinct from professional athletics," and fostering "better alignment between Division I athletics and academics").

2025-2026 season and such request was denied. (JA1108.) Robinson's appeal was

also denied. (JA1108.)

| Academic Year | Institution | Years of Eligibility | Season of Competition Used |
|---|---|---|---|
| 2019-2020 | JUCO | 1 | 1 |
| 2020-2021 | JUCO | - | None, due to COVID |
| 2021-2022 | Division I | 2 | None, redshirt |
| 2022-2023 | Division I | 3 | 2 |
| 2023-2024 | Division I | 4 | 3 |
| 2024-2025 | Division I | 5 | 4 |
| *Proposed 2025-2026* | *Division I* | *6* | *5* |

### B.    Jeffrey Weimer

Weimer started his collegiate football career in 2018 at Hartnell College, a

JUCO, where he played football in the 2018-2019 and 2019-2020 (redshirt) seasons.

(JA1108, JA1108.) In 2020, Weimer transferred to City College of San Francisco

("CCSF"), another JUCO. While at CCSF, the 2020-2021 football season was

cancelled due to COVID-19. (JA1109.) Weimer was able to compete in the 2021-

2022 season while at CCSF. In 2022, Weimer transferred to the University of

Nevada, Las Vegas ("UNLV") and competed in the 2022-2023 football season

(JA1109.) Weimer did not attend college during the 2023-2024 academic years due

to personal circumstances. (JA1109.) For the 2024-2025 academic year, Weimer

enrolled at Idaho State University and competed with the football team.

9

At this point, Weimer had exhausted his eligibility clock (both the four seasons of competition and five years of eligibility). (JA1110.) Despite this, in 2025, Weimer transferred to West Virginia University ("WVU"), where, like Robinson, he erroneously believed he would be granted a waiver and withdrew from the NFL draft. (JA1109, JA1111.) While at WVU, Weimer sought a waiver to compete in the 2025-2026 season and such request was denied. (JA9.) Weimer's appeal was also denied. (JA1109.)

| Academic Year | Institution | Years of Eligibility | Season of Competition Used |
|---|---|---|---|
| 2018-2019 | JUCO | 1 | 1 |
| 2019-2020 | JUCO | 2 | None, redshirt |
| 2020-2021 | JUCO | - | None, due to COVID |
| 2021-2022 | JUCO | 3 | 2 |
| 2022-2023 | Division I | 4 | 3 |
| 2023-2024 | None | - | - |
| 2024-2025 | Division I | 5 | 4 |
| *Proposed 2025-2026* | *Division I* | *6* | *5* |

## C.    Tye Edwards

Edwards started his collegiate football career in 2019 at Georgia Military College, a JUCO. (JA1110.) The following year, Edwards transferred to Hutchinson Community College, another JUCO, for the 2020-2021 and 2021-2022 academic years. While at Hutchinson, the 2020-2021 football season was cancelled due to COVID-19. (JA1110.) Edwards was able to compete in the 2021-2022 season. In 2022, Edwards transferred to UTSA, where he competed in the 2022-2023 season

as a redshirt. In 2023, Edwards transferred to Northern Iowa, where he competed in 2023-2024 and 2024-2025. (JA561, JA1110.)

At this point, Edwards had exhausted his eligibility clock (both the four seasons of competition and five years of eligibility). (JA1111.) Despite this, in 2025, Edwards transferred to West Virginia University ("WVU"), where he withdrew from the NFL draft for the same reason as Robinson and Weimer. (JA1111.) While at WVU, Edwards sought a waiver to compete in the 2025-2026 season and such request was denied. (JA1111.) Edwards's appeal was also denied. (JA1111.)

| Academic Year | Institution | Years of Eligibility | Season of Competition Used |
|---|---|---|---|
| 2019-2020 | JUCO | 1 | 1 |
| 2020-2021 | JUCO | - | None, due to COVID |
| 2021-2022 | JUCO | 2 | 2 |
| 2022-2023 | Division I | 3 | None, redshirt |
| 2023-2024 | Division I | 4 | 3 |
| 2024-2025 | Division I | 5 | 4 |
| *Proposed 2025-2026* | *Division I* | *6* | *5* |

### D.    Justin Harrington

Harrington started his collegiate football career in 2018 at Bakersfield Community College, a JUCO, where he played football in the 2018-2019 and 2019-2020 seasons. (JA1112.) In 2020, Harrington transferred to the University of Oklahoma, where he competed in the following football seasons: 2020-2021 (medical redshirt), 2021-2022 (redshirt), 2022-2023, 2023-2024 (medical redshirt).

11

(JA1112.) In 2024, Harrington transferred to the University of Washington and competed in the 2024-2025 football season. (JA1112.)

At this point, Harrington had exhausted his eligibility clock (both the four seasons of competition and five years of eligibility). (JA1112.) Despite this, in 2025, Harrington transferred to West Virginia University ("WVU"), where he (like Robinson, Weimer, and Edwards) erroneously believed he would be granted a waiver and withdrew from the NFL draft. (JA1112.) While at WVU, Harrington sought a waiver to compete in the 2025-2026 season and such request was denied. (JA1112.) Harrington's appeal was also denied. (JA1112.)

| Academic Year | Institution | Years of Eligibility | Season of Competition Used |
|---|---|---|---|
| 2018-2019 | JUCO | 1 | 1 |
| 2019-2020 | JUCO | 2 | 2 |
| 2020-2021 | JUCO | - | None, due to COVID |
| 2021-2022 | JUCO | 3 | None, redshirt |
| 2022-2023 | Division I | 4 | 3 |
| 2023-2024 | None | 5 | None, redshirt |
| 2024-2025 | Division I | 6 | 4 |
| *Proposed 2025-2026* | *Division I* | *7* | *5* |

## III.  Alleged Impact of *Pavia* on Appellees.

On December 18, 2024, the United States District Court for the Middle District of Tennessee issued an opinion in *Pavia*, 760 F. Supp. 3d 527. After two years at a JUCO (2020 and 2021)—only one of which counted toward his eligibility due to the COVID-19 waiver—Pavia joined New Mexico State University

("NMSU") and played for two seasons (2022 and 2023). He played for one season at Vanderbilt University (2024), thus using up his final season of competition (but not his fifth year of eligibility). Pavia then sought an injunction seeking to have his 2021 season of play at the JUCO not count towards his four seasons of competition.

On December 18, 2024, the district court granted Pavia's requested preliminary injunction. On December 23, 2024, the NCAA Division I Board of Directors issued a blanket waiver of the four-seasons-of-competition limit for similarly situated players, allowing those student-athletes to participate in one additional season of competition. But there was a critical limitation on the waiver. Under its terms, a student-athlete would be ineligible for the waiver if they could not complete the additional season of competition within his five-year window of eligibility. In other words, the *Pavia* waiver did not in any way impact or extend the five-year time period in which a student-athlete must complete their four seasons of competition, so student-athletes who had already exhausted their five years of eligibility were not covered by the waiver. (JA561, JA562.)

Because Appellees no longer had any time remaining of their five years of eligibility after the 2024-25 season, the *Pavia* waiver did not apply to them. (JA562.) Thus, the NCAA did not apply the *Pavia* waiver to Appellees' waiver applications or their subsequent appeals.

Despite knowing that eligibility would be an issue for each Appellee, Appellees waited until August 1, 2025, the eve of the commencement of football season, to file this action against the NCAA in the United States District Court for the Northern District of West Virginia, alleging that the Five-Year Rule violated the Sherman Act by counting time spent playing a collegiate sport at a JUCO towards player's eligibility limits. (*See generally* JA6-38.) Appellees moved for a TRO and preliminary injunction requiring the NCAA to grant waivers of the Five-Year Rule so they could play for WVU in the 2025-26 season. (*See generally* JA6-38.)

## IV.    The Preliminary Injunction Hearing.

On August 19, 2025, the District Court held a hearing on Appellees' Motion. At the hearing, the parties decided to forego live witnesses, and the District Court considered briefing and argument submitted by the parties. Of note, Appellees' briefing attached an expert report of Dr. Joel Maxcy from the *Elad* case, which is on appeal.[7]

Dr. Maxcy purported to define the relevant antitrust market in *Elad* as "the labor market for college football in general and NCAA Division I football specifically." (JA679.) However, Dr. Maxcy performed no economic or other analysis to define such a market. (JA646.) Instead, he simply endorsed the market that he claimed had been defined—also without any economics or analysis—by the

---

[7] The District Court acknowledged that Dr. Maxcy did not prepare a report for this dispute. (JA1146.)

courts in *Pavia*, *Alston*, and other cases. (JA694.) Dr. Maxcy concluded that JUCOs are reasonable substitutes for NCAA Division I schools and thus compete with those schools for elite college football players in a single antitrust labor market. (JA643.) He also opined that the Five-Year Rule harms competition in that alleged market by discouraging athletes from attending JUCOs, thus putting JUCOs at a competitive disadvantage and depressing the value of NIL deals for eligible players. (JA647.)

Despite Dr. Maxcy's claim, the *Alston* court *excluded* JUCOs from its market definition, so there was no basis for Dr. Maxcy to suggest that *Alston* provided support for his market definition. *See Alston*, 594 U.S. at 81 (defining the market as "the market for 'athletic services in men's and women's Division I basketball and FBS football'" and explaining that the rule of reason "analysis generally requires a court to 'conduct a fact-specific assessment of market power and market structure' to assess a challenged restraint's 'actual effect on competition.'").

Moreover, Dr. Maxcy did no *economic* analysis, as is required under antitrust law. He failed to perform a Small But Significant Non-transitory Increase in Price ("SSNIP") test or a hypothetical monopolist test—standard methodologies for defining relevant antitrust markets. (JA996.) He similarly offered no economic analysis of consumer demand and provided no evidence that JUCO programs constrain the benefits offered by Division I programs to prospective athletes, such

that they could be considered competitive alternatives. (JA646.) In fact, Dr. Maxcy did no analysis whatsoever of any data regarding college sports today.

Dr. Maxcy's market, which includes both Division I institutions and JUCOs, also failed on its own terms. If JUCOs actually competed with Division I football, Appellees would have been able to provide the District Court with examples of players who chose to attend a JUCO despite qualifying for Division I football opportunities. Dr. Maxcy, however, did not study the frequency of Division I football players opting to move from Division I football to a JUCO football program. (JA999.) Instead, he acknowledged that when a player moves from Division I football to JUCO, the most likely reason is that the Division I player has become ineligible to participate in Division I football. (JA999.)

Dr. Maxcy also acknowledged that, unlike playing for a JUCO, participating in Division I football allows athletes to maximize their chances to play professional sports. (JA1009.) Unlike Division I football games, JUCO football games are generally not broadcast on national television and therefore do not provide comparable publicity. (JA1011.) And unlike Division I football players, JUCO football players do not have realistic opportunities to obtain personal sponsorship opportunities, marketing deals, and NIL contracts. (JA1011-1012.)

Finally, Dr. Maxcy offered no evidence comparing average NIL deals offered to incoming students with NIL deals offered to more experienced student-athletes.

16

(JA997.) He merely speculated that more experienced student-athletes receive higher NIL compensation, with no supporting research or analysis. (JA998.) He asserted that the market for Division I football players might be more complex, (JA848, JA819), but he offered no economic explanation for why traditional economic principles do not apply to this marketplace. Rather, he based this assertion on his "intuition." (JA999.)

## V.    The District Court Granted the Preliminary Injunction.

On August 20, 2025, the District Court granted a mandatory injunction, requiring the NCAA to waive the Five-Year Rule as to Appellees for the 2025-26 season. In finding that Appellees had shown a likelihood of success on the merits of their Sherman Act claim, the District Court relied almost exclusively on the *Pavia*, *Elad*, similar district court decisions, and Dr. Maxcy's report.

First, the District Court found that the NCAA's eligibility rules are subject to the Sherman Act. The District Court acknowledged that court previously held that the Sherman Act does not apply to the NCAA's eligibility requirements. (JA639.) *Smith v. NCAA*, 139 F.3d 180, 185 (3d Cir. 1998). Nonetheless, the District Court believed that, in a post-NIL world, there is a "shifting paradigm in the approach towards classifying the NCAA Bylaws as commercial. (JA1116.) Specifically, quoting *Pavia*, the District Court stated that the *Alston* decision and emergence of NIL contracts "drastically changed the landscape of collegiate athletics." (JA1118.)

17

The District Court held that it was "left to intuit how our higher courts would rule when faced with the same facts before it." (JA1119.) And thus, the District Court found that, in the absence of "guidance from the Fourth Circuit or the Supreme Court," it would "align[] with [the] *Pavia*, *Elad*, and *Braham*" district court decisions in concluding that "the Five-Year Rule are commercial in nature and therefore subject to the Sherman Act." (JA1119.) Consequently, the District Court held, contrary to *Smith*, that the NCAA's eligibility rules are "commercial" because "[t]hey dictate the number of years a student-athlete can market and profit from a NCAA Division I career." (JA1119.) The District Court recognized that, in holding as such, it had "necessarily chosen not to follow the reasoning of the majority and other well-intentioned district courts that have more recently found that the NCAA's eligibility rules are not commercial in nature." (JA1120.)

The District Court then found that the Five-Year Rule is anticompetitive. In doing so, the District Court merely relied on prior findings by the *Pavia*, *Elad*, and *Branham* courts that the relevant market was "the nationwide market for the labor of NCAA Division I college football players." (JA1123-1124.) The District Court found that the Five-Year Rule "gives a competitive advantage to NCAA Division I member schools over junior colleges" because players would not choose to attend a JUCO at the expense of an additional year in Division I. (JA1126.) The District Court concluded that because NIL opportunities are "disproportionately offered to

18

Division 1 athletes[,]" the Five-Year Rule "induce potential football players to attend NCAA institutions rather than non-NCAA institutions even when non-NCAA institutions, such as junior colleges, might be in their best interest." (JA1127.)

Finally, the District Court found that the NCAA's procompetitive justifications for the Five-Year Rule were not persuasive. (JA1098.) As to preserving Division I football as a unique product, the District Court did not give further explanation. (*Id*.) The District Court was also "not persuaded" with the NCAA's argument that, without the Five-Year Rule, "student-athletes will necessarily lose opportunities they otherwise would have received" to those who remain "longer than they are currently eligible," given that transfers "take a position that might otherwise go to an incoming freshman player." (JA1131.) The Court did not recognize that transfers are limited to those student-athletes who remain eligible to compete and, thus, do not allow ineligible, older students to crowd out younger student-athletes for spots on college athletic teams.

## SUMMARY OF ARGUMENT

The District Court erred in finding that Appellees showed by clear evidence that they have a likelihood of success on the merits of his Sherman Act claim and irreparable harm, as required to support a mandatory injunction.

First, the District Court improperly rejected circuit court precedent holding that the NCAA's eligibility rules are not subject to the Sherman Act. *See* JA1115.

This Court has never opined differently on cases such as *O'Bannon, Smith,* and the many circuit courts that have agreed with their reasoning and/or results. Moreover, contrary to the District Court's opinion, the Supreme Court's decision in *Alston* did not overrule or undercut such circuit court decisions. *Alston* addressed compensation rules, not eligibility rules, and was "more scalpel than ax," as multiple district courts have since held.

Second, the District Court failed to identify a relevant market based on economic research applicable to this case. To the extent the District Court implicitly adopted the market definition of *Elad*'s expert Dr. Maxcy, it committed clear error because Dr. Maxcy cited no evidence to support the existence of that market but merely relied on *Pavia* and *Alston*. Market definition is an economic exercise, and Plaintiff offered only an economist's interpretation of legal opinions—rather than any analysis of data or current market conditions, as *Alston* requires.

Third, the District Court erred in finding that the Five-Year Rule is anticompetitive. To support this finding, the District Court again relied on *Pavia*, which is not evidence, and Dr. Maxcy, who again did not present any evidence or economic analysis to support his opinions.

Fourth, the District Court committed clear error in rejecting the NCAA's procompetitive justifications, which have been accepted by courts around the country.

Finally, the District Court erred in finding that Appellees established a risk of irreparable harm and in balancing the equities.

## LEGAL STANDARD AND STANDARD OF REVIEW

A preliminary injunction is "an extraordinary remed[y] involving the exercise of very far-reaching power." *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013); *see Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020). To obtain a preliminary injunction, Plaintiff must show that: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm if the injunctive relief is denied; (3) the balance of equities tips in his favor; and (4) injunctive relief would be in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *dmarcian, Inc. v. dmarcian Eur. BV*, 60 F.4th 119, 138 (4th Cir. 2023). A district court need not consider all four *Winter* factors if one is clearly absent. *See Henderson ex rel. NLRB v. Bluefield Hosp. Co.*, 902 F.3d 432, 439 (4th Cir. 2018).

The traditional function of a preliminary injunction is to maintain the status quo. *See Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 209 (4th Cir. 2024). However, Plaintiff seeks a "mandatory" preliminary injunction that would "alter[] the status quo before the case even begins." *Id*. Mandatory preliminary injunctions are "disfavored[] and warranted only in the most extraordinary circumstances." *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994). To meet the heavy burden of a mandatory preliminary injunction, Plaintiff cannot rely on conclusory

allegations or amorphous threats of potential harm or injury to himself. Rather, he must present evidence clearly demonstrating that he is likely to prevail on the merits under the Sherman Act. *See Mahmoud v. McKnight*, 102 F.4th 191, 203 (4th Cir. 2024).

The review of a district court's grant or denial of a motion for a preliminary injunction is done so for abuse of discretion. *Di Biase v. SPX Corp.*, 872 F.3d 224, 229 (4th Cir. 2017). In determining whether the district court abused its discretion, the Fourth Circuit reviews the district court's factual findings for clear error and its legal conclusions *de novo*. *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 188 (4th Cir. 2013); *Frazier v. Prince George's Cnty., Maryland*, 86 F.4th 537, 543 (4th Cir. 2023).

## **ARGUMENT**

### I. **The District Court Erred by Finding that Appellees Showed a Likelihood of Success on the Merits of Their Antitrust Claim.**

The District Court erred by finding that Appellees showed a likelihood of success on the merits of their antitrust claim by clear evidence. To prevail on their Sherman Act claim, Appellees must demonstrate that the Five-Year Rule is subject to § 1 of the Sherman Act. "Section one, by its terms, does not apply to all conspiracies, but only to those which restrain 'trade or commerce.'" *United States v. Brown Univ.*, 5 F.3d 658, 665 (3d Cir. 1993) (quoting 15 U.S.C. § 1). Accordingly, "[i]t is axiomatic that section one of the Sherman Act regulates only transactions that

are commercial in nature." *Id.*; *Am. Bd. Opticianry & Nat'l Contact Lens Examiners, Inc. v. Inst. Credentialing Excellence*, No. 1:15-cv-1169, 2016 WL 11668712 (E.D. Va. Mar. 4, 2016) (dismissing claim because plaintiffs failed to allege that challenged conduct was "primarily commercial in nature"). The "dispositive inquiry" is not whether "the *entity* engaging in the [challenged conduct] is commercial" but whether the conduct itself is commercial. *Virginia Vermiculite, Ltd. v. W.R. Grace & Co.*, 156 F.3d 535, 541 (4th Cir. 1998) (emphasis in original); *see also Bassett v. NCAA*, 528 F.3d 426, 433 (6th Cir. 2008) (stating that the "appropriate inquiry is 'whether the rule itself is commercial, not whether the entity promulgating the rule is commercial.'") (quoting *Worldwide Basketball & Sport Tours, Inc. v. NCAA*, 388 F.3d 955, 959 (6th Cir. 2004)).

Appellees must show that the Five-Year Rule unreasonably restrains trade. "The plaintiff may satisfy this burden by proving the existence of actual anticompetitive effects, such as reduction of output...increase in price, or deterioration in quality of goods or services," or through "proof of the defendant's...ability to raise prices above those that would prevail in a competitive market." *Id.* (citation omitted). "[T]he burden [then] shifts to the defendant to show that the challenged conduct promotes a sufficiently pro-competitive objective." *Id.* at 669. The plaintiff then "must demonstrate that the restraint is not reasonably necessary to achieve the stated objective." *Id.*

The District Court erred at every step of this analysis.

### A.  Circuit Court Precedent Makes Clear that Eligibility Rules are Non-Commercial and Thus Not Subject to Antitrust Scrutiny.

NCAA eligibility rules like the Five-Year Rule are either non-commercial rules that are immune from antitrust scrutiny or that, if scrutinized, easily withstand antitrust challenges. *See O'Bannon v. NCAA*, 802 F.3d 1049, 1079 (9th Cir. 2015) (rules that limit the number of years a student-athlete may compete are "true eligibility rules" that are not commercial). *See also Smith v. NCAA*, 139 F.3d 180 ("[T]he Sherman Act does not apply to the NCAA's promulgation of eligibility requirements."). Eligibility rules are "not related to the NCAA's commercial or business activities" because they "primarily seek to ensure fair competition in intercollegiate athletics." *Id.* at 185.

Several courts addressing the validity of the NCAA's eligibility rules under the Sherman Act have reached the same conclusion. *See, e.g.*, *Coley*, 2025 WL 1616719, at *6 (holding that "the Sherman Act does not apply to the eligibility rules in the Challenged Bylaws"); *Bassett*, 528 F.3d at 433 (holding that the Sherman Act did not apply to NCAA rules on athlete recruitment); *Goldstein*, 2025 WL 662809, at *4 (holding that the Five-Year Rule is not "commercial in nature despite [Goldstein's] efforts to intertwine [it] with what he and his agent swear are 'significant' opportunities to capitalize off his NIL"); *Gaines v. NCAA*, 746 F. Supp. 738, 743 (M.D. Tenn. 1990) (holding that rules denying eligibility to student-athletes

who entered a professional sports draft or hired an agent were not "subject to scrutiny under § 2 of the Sherman Act" because "they are not designed to generate profits in a commercial activity" and instead act to preserve what makes NCAA competition unique); *see also Jones v. NCAA*, 392 F. Supp. 295, 303 (D. Mass. 1975); *Adidas Am., Inc. v. NCAA*, 40 F. Supp. 2d 1275, 1285 (D. Kan. 1999).

Moreover, the Supreme Court's decision in *Alston* did not implicitly overrule *Smith* or the raft of lower court caselaw upholding eligibility rules. Neither *Alston* nor its predecessor *O'Bannon*, 802 F.3d 1049, cast any doubt as to the validity of eligibility rules. Rather, those cases concerned only *compensation* rules.[8]

In *O'Bannon*, the Ninth Circuit affirmed *Smith*'s core holding, even as it held that *other* NCAA rules were subject to the rule of reason. *O'Bannon*, 802 F.3d at 1053. In *O'Bannon*, the plaintiffs challenged the NCAA's rules limiting the goods and services that member schools can provide to student-athletes, including, *inter alia*, the commercial use of student-athletes' NIL. *Id.* at 1053, 1055-56. The court accepted that challenge in part, but only because the rules being challenged were compensation rules, *not* "mere 'eligibility rules.'" *Id.* at 1064-65. *O'Bannon* actually cited *Smith* to distinguish commercial rules, which are subject to the Sherman Act,

---

[8] "The court recognizes that *Alston* changed the game to the extent that the Supreme Court eliminated the NCAA's ability to restrict what 'education-related benefits' colleges could provide as compensation to student-athletes. But the Supreme Court in *Alston* did not subject all the NCAA's Division I Bylaws to antitrust scrutiny. Rather, in *Alston*, the Court addressed 'only a narrow subset of the NCAA's compensation rules—namely, the rules restricting the education-related benefits that student athletes may receive, such as post-eligibility scholarships at graduate or vocational schools." *Coley*, 2025 WL 1616719, at *5 (citations omitted).

from eligibility rules, which are not. The former "clearly regulate the terms of commercial transactions" by "regulat[ing] what compensation NCAA schools may give student-athletes, and how much"—unlike "a true 'eligibility' rule, *akin to the rules limiting the number of years that student-athletes may play collegiate sports* or requiring student-athletes to complete a certain number of credit hours each semester." *Id.* at 1065-66 (emphasis added).

Like *O'Bannon*, *Alston* did not involve "true 'eligibility' rules." The Court tailored its decision and analysis to "compensation" rules—a term the Court repeated throughout its opinion. *Alston*, 594 U.S. at 80, 82-84, 87 (describing the rules as involving "compensation limits," "power to restrain student-athlete compensation," "cap[ping] artificially the compensation offered to recruits," "terms of compensation," "compensation restrictions," "challenged compensation rules," "new types of compensation," and "rules that...restrict compensation and benefits unrelated to education"). The holding itself—more "scalpel than ax"—was exceedingly narrow and involved rules that had limited the education-related benefits schools could offer as compensation to student-athletes. *Alston*, 594 U.S. at 74. Like *O'Bannon*, *Alston* related to the goods and services that member schools may offer to student-athletes for their athletic services. *Id.* at 80. Indeed, Justice Kavanaugh's concurrence explicitly took for granted that NCAA eligibility rules are legitimate: he stressed that *Alston* addressed "only a narrow subset of the NCAA's

compensation rules" and stated that "[e]veryone agrees that the NCAA can require student-athletes to be enrolled students in good standing." *Id*. at 108, 110 (Kavanaugh, J., concurring).

Other courts have recognized this straightforward reality, agreeing that "[n]othing in *Alston* states that all NCAA eligibility rules are commercial in nature." *Osuna Sanchez*, 2025 WL 684271, at *3 (internal citation omitted); *accord Goldstein*, 2025 WL 662809 at *4.

Instead of relying on this myriad of other caselaw which constitutes a majority, as admitted by the District Court, the District Court aligns itself with three district court cases which were, and are still, pending appeal. Absent binding precedent to the contrary, this Court should not create a circuit split, and should follow the decisions of those circuit courts before it in upholding the validity of the NCAA's eligibility rules.

### B. The District Court Failed to Define a Relevant Market Based in Reason and Economic Analysis.

Even if the Sherman Act did apply to the Five-Year Rule, Appellees failed to establish a relevant antitrust market based on economic analysis—a necessary first step in any antitrust analysis. An antitrust market is the "arena within which significant substitution in consumption or production occurs." *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018). "[T]wo products are in the same market...'if they are readily substitutable for one another,' an inquiry that requires [a court] to assess 'the

reasonable interchangeability of use between a product and its substitute.'" *Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 435 (3d Cir. 2016) (quoting *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007)).

"[T]he cases make it clear that...a market definition is fundamental to evaluating the reasonableness of the [alleged] restraint" on trade. *Am. Motor Inns., Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1248 (3d Cir. 1975). "Without a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition." *Ohio*, 585 U.S. at 543 (alterations in original). The District Court merely stated that it accepted Appellee's market definition and failed to make any findings as to whether that market actually exists. Ultimately, Appellees had the burden to provide a fact-specific assessment of the relevant market definition for this case and failure to provide the same. The "burden is on the antirust plaintiff to define the relevant market and the failure to identify a relevant market is a proper ground of dismissing a Sherman Act claim." *Worldwide Basketball*, 388 F.3d at 959. As such, the court below erred in making a finding to the contrary.

The District Court erred in relying on *Alston* to define the relevant market. In *Fourqurean*, the Seventh Circuit specifically addressed the erroneous reliance on *Alston* by the lower court: "As an initial matter, Fourqurean relies entirely on *Alston* to define the relevant market. In his and the district court's view, the Supreme Court in *Alston* established that men's NCAA Division I FBS football is a relevant market.

But Fourquean overstates the scope of the Court's ruling. The *Alston* Court did not decide the question of market definition. Instead, it noted that the parties did not challenge the district court's definition of the relevant market as 'the market for athletic services in men's and women's Division I basketball and FBS football' and 'observ[ed] that the NCAA enjoys near complete dominance of, and exercises monopsony power in,' that market." *Fourquean v. Nat'l Collegiate Athletic Ass'n*, 143 F.4th 859, 870 (7th Cir. 2025) (quoting *Alston*, 594 U.S. at 81). Here, the District Court went so far as to acknowledge this holding (JA1124, n.14) yet similarly, and erroneously, relied on *Alston* to formulate the relevant market and, thus, improperly defined a relevant market.

The District Court contradicted itself when it concluded, on one hand, that *Alston* had changed market realities, (JA1117-JA1118), but that *Alston*'s definition of a relevant market could be adopted wholesale without examining the new market realities existing now, (JA1117-JA1118). *Alston* itself notes that the rule of reason "analysis generally requires a court to 'conduct a fact-specific assessment of market power and market structure' to assess a challenged restraint's 'actual effect on competition.'" 594 U.S. at 81 (quotation omitted). If *Alston* created new market realities, then *Alston*'s market definition cannot be uncritically adopted in new cases. *See Pavia v. NCAA*, No. 24-6153, 2025 WL 2787816, at *7 (6th Cir. Oct. 1, 2025) (Thapar, J., concurring) ("The absence of cold, hard data is especially glaring in a

market that is rapidly changing. It's hard to perform 'a careful analysis of market realities' when the parties haven't grappled with recent changes." (citing *Alston*, 594 U.S. at 93)).

To the extent that the District Court implicitly adopted Appellees' proposed definition of a relevant market as "supported" by Dr. Maxcy's market definition formulated in *Elad*, it abused its discretion. As an initial matter, Federal Rule of Evidence 702 requires that expert opinions be based on sufficient facts or data, be the product of reliable principles and methods, and reflect a reliable application of those principles and methods to ***the facts of the case***. It is impossible for Appellees to meet this requirement through the use of an expert opinion rendered for a different, older case. If the Court sees fit to continue its analysis regardless of this fundamental failure by Appellees, Dr. Maxcy's report is still insufficient and devoid of the necessary assessment.

First, Dr. Maxcy's opinions are not supported by any evidence. Despite conceding that he is "an expert in economics and not the law," (JA535, ¶ 11), Dr. Maxcy did not discuss any economic methodology for defining the relevant market or cite a shred of economic evidence to support his proposed market: no data; no SSNIP Test or hypothetical monopolist analyses; nothing. (*See* JA996-999, ¶¶ 96-

105.)[9] Rather, Dr. Maxcy relied almost exclusively on the *Pavia* decision to establish his proposed market. (JA682, ¶ 14.) The opinion of another court, however, is not evidence. *See PNC Bank, Nat'l Ass'n v. 2013 Travis Oak Creek, L.P.*, 136 F.4th 568, 575 (5th Cir. 2025) ("Because the factual findings of another court cannot overcome Rule 201's indisputability requirement, we decline to take judicial notice of such facts here."); *Hausknecht v. John Hancock Life Ins. Co. of N.Y.*, 614 F. Supp. 3d 168, 176 n.1 (E.D. Pa. 2022) ("[E]very Court of Appeals that has considered the issue has held that it is improper to judicially notice the truth of prior judicial findings of fact."). Indeed, a contrary rule would render the doctrine of collateral estoppel a nullity. *Hausknecht*, 614 F. Supp. 3d at 176 n.1.

Second, Dr. Maxcy contradicted himself when trying—unsuccessfully—to define a relevant market for antitrust purposes. Dr. Maxcy starts out by suggesting that the relevant market is "the labor market for college football athletes in general and NCAA Division I football specifically." (JA681-682, ¶ 13.) This definition purports to include JUCO football. Dr. Maxcy, however, in the very next paragraph of his report claims that his definition is consistent with *Alston*. (JA682, ¶ 14.) The market in *Alston* was defined as "the market for athletic services in men's and women's Division I basketball and FBS [Football Bowl Subdivision][10] football."

---

[9] Dr. Maxcy's Report is not only insufficient to support the District Court's decision, but also inadmissible under Federal Rules of Evidence 702 and 703, which require expert opinions to be supported by reliable methodologies and sufficient facts and data.

[10] Division I football includes FBS.

*Alston*, 594 U.S. at 81. Thus, the market as defined in *Alston* explicitly excluded JUCO football. Dr. Maxcy then, later in his report, reverses course, stating, "JUCOs are most certainly included in the relevant market for football players with the NCAA." (JA693, ¶ 51.) With no economic evidence or any quantitative analysis at all, Dr. Maxcy's inconsistent speculation on the relevant market for antitrust purposes is insufficient to carry Appellees' high burden for a mandatory preliminary injunction.

In short, the District Court made no appropriately supported findings as to the relevant market. There is not a single piece of factual material or data in the record supporting the market definition adopted here.[11] *See Pavia*, 2025 WL 2787816, at *7. At bottom, like the rest of the District Court's decision, any finding that the District Court may have made as to the relevant market boils down to an improper adoption of *Pavia*.

### C.    The District Court Erred in Finding that the Five-Year Rule Has Anticompetitive Effects.

The District Court also erred in finding that the Five-Year Rule was anticompetitive within the alleged market. There is no record evidence, from Dr.

---

[11] The opinion below acknowledges that Appellees had no evidence to support their market definition. "Plaintiffs assert the relevant market 'is the nationwide market for the labor of NCAA Division I college football players.'" (JA1123.) Under *American Express*, 585 U.S. at 529, plaintiffs "ha[ve] the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market . . . ." (JA1122.) Instead of requiring proof, the district court here relied on opinions, which are not evidence. *See also Larry v. Nat'l Collegiate Athletic Ass'n,* No. 25-CV-01761-GPG-CYC, 2025 WL 2725188, at *3 (D. Colo. Aug. 6, 2025).

Maxcy or otherwise, showing that the Five-Year Rule lessens the total benefits that student-athletes receive from schools, reduces the total number of intercollegiate competition opportunities or participation, or reduces the quality of what institutions offer to players. Rather, the Five-Year Rule ensures opportunities for new student-athletes as players exhaust their eligibility, which does not amount to anticompetitive harm.

Many other courts have also concluded that the NCAA's eligibility rules are not anticompetitive. Rather, eligibility rules are clearly necessary to preserve the student-athlete in college football because they define what it means to be a student athlete, and are therefore essential to the very existence of the product of college football. *See Alston*, 594 U.S. at 87-88; *accord McCormack v. NCAA*, 845 F.2d 1338, 1344-45 (5th Cir. 1988) (recognizing that "eligibility rules create the product and allow its survival"); *Bewley v. NCAA*, No. 23 CV 15570, 2024 WL 113971, at *3 (N.D. Ill. Jan. 10, 2024) (observing that the challenged rule "directly promotes defendant's 'unique product'"), *appeal dismissed*, No. 24-1213, 2024 WL 3742287 (7th Cir. Mar. 13, 2024).

Eligibility requirements are "presumptively procompetitive." *Coley*, 2025 WL 1616719, at *7 ("Under Coley's theory, all NCAA Division I Bylaws that could potentially affect a player's ability to earn NIL compensation would violate the Sherman Act.... This court declines to interpret *Alston* or the Sherman Act to compel

33

this nonsensical outcome."); *see also* Statement of Interest of the U.S. at 8 n.2, *Zeigler v. NCAA*, No. 3:25-cv-00226 (E.D. Tenn. June 3, 2025) (Doc. No. 28) ("[R]ules that are fundamental to the exercise of college sports would typically present procompetitive benefits enabling their approval under a fact-specific application of the rule-of-reason framework.").

Contrary to the District Court's findings, there is no evidence that Division I schools have "a recruiting advantage...over junior colleges." (JA20.) To support this finding, the District Court again relied solely on Dr. Maxcy and *Pavia*. But as explained above, *Pavia* is not evidence, and numerous courts have disagreed with it on this issue. As also explained above, Dr. Maxcy did not cite any facts or data showing that JUCOs compete against Division I schools at all, let alone that the Five-Year Rule affects that competition.

Moreover, even if Appellees' (and Dr. Maxcy's) speculative assertions that the Five-Year Rule deter certain players from electing to attend a JUCO prior to attempting to compete in Division I football were supported by evidence, they would at most reflect harm to specific competitors, not harm to competition. Rather, antitrust laws are intended to protect the competitive process, not any particular participant in that process. *See, e.g.*, *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 345 (1990); *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962) (antitrust laws were enacted for "the protection of competition not

competitors"). Thus, "a party asserting claims under the antitrust laws must prove...that it has suffered an 'antitrust injury.'" *Wyndham Vacation Ownership, Inc. v. Montgomery L. Firm, LLC*, No. 8:19-CV-1895-CEH-CPT, 2021 WL 4948151, at *11 (M.D. Fla. Oct. 18, 2021). To obtain injunctive relief under antitrust laws, the harm Plaintiff alleges must be an injury "of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Antitrust injury consists of "an effect on price or output" in the market, and not merely harm to Plaintiff himself (or others similarly situated). *Continental Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 516-17 (4th Cir. 2002) (vacating district court injunction because plaintiff had shown only that it lost profits, but not any loss "from a competition-reducing aspect or effect of the defendant's behavior" (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990)). The District Court's reliance on alleged "harms" to the recruiting power of JUCOs or the willingness of individual students to attend JUCOs is thus improper.

Nor is there any evidence that removing players with the JUCO Rule distorts the labor market by depressing the prices at which Division I schools can acquire athletes, and the pay athletes can earn in NIL agreements. (JA1015.) Dr. Maxcy speculated that the Five-Year Rule replaces experienced student-athletes likely to earn higher NIL compensation with less-experienced student-athletes likely to earn

lower NIL compensation. But, again, Dr. Maxcy provided no support for this position and relied solely on his own "intuition."[12] *See Fourqurean*, 143 F.4th at 870-71 (plaintiff's theory of harm made no sense, because "[u]nder ordinary principles of supply and demand, a restraint that limits the supply of workers in a labor market would increase, not decrease, worker compensation"); *Arbolida*, 2025 WL 579830, at *3 (finding the current eligibility rules "limit the total potential supply" but "seem to increase competition among the NCAA member institutions...for the limited supply of potential labor").

Finally, the District Court cannot be correct that restrictions on who can compete (and earn NIL compensation) and for how long necessarily have anticompetitive effects. That conclusion sweeps aside all NCAA rules defining who is a student-athlete eligible to compete in intercollegiate athletics. The Five-Year Rule has no impact on how much NIL compensation is available and it produces a net zero effect on the total number of Division I football players who can earn it. Only so many student-athletes can be on the field or a roster at any given time. When one student-athlete's collegiate career comes to an end, another assumes the spot and can begin enjoying the benefits associated with playing college sports. Indeed, when Appellees received another season to earn NIL compensation, it was at the expense

---

[12] In fact, Dr. Maxcy's position conflicts with basic economic laws of supply and demand, under which relaxing eligibility rules and expanding the supply of student athletes who could receive NIL compensation would place downward pressure on compensation for student-athletes.

of other student-athletes. Moreover, *all* inherently eligibility rules restrict who can compete and earn NIL compensation. The logic of the District Court's opinion could apply to other eligibility rules, including rules requiring minimum grade point averages and progress toward a degree. Taken to its logical extreme, Plaintiffs' argument suggests that football rules permitting only eleven players on the field for one team at one time is anticompetitive; if twelve were allowed, the twelfth player would have greater access to the benefits of participation. Antitrust law does not permit such judicial "second-guess[ing] [of] degrees of reasonable necessity." *Alston*, 594 U.S. at 98 (cleaned up).

### i. The District Court Contravened Precedent When Finding Anticompetitive Effects on the "Twinkling of an Eye."

The Supreme Court in *Alston* made clear that challenges to the NCAA's commercial rules must be evaluated under the rule of reason—a review that requires a careful analysis of the alleged restraint's impact on competition in a defined relevant market. *Alston*, 594 U.S. 69. But the district court applied "twinkling of an eye" analysis, (JA1135), and allowed Appellees to shirk their duty to provide evidence of anticompetitive effects.

*Alston* recognized that "sometimes we can determine the competitive effects of a challenged restraint in a twinkling of an eye" but that analysis was only appropriate "for restraints at opposite ends of the competitive spectrum...rather than

restraints in the great in-between," 594 U.S. at 88 (quotation omitted). *Alston*
recognized that challenges to the NCAA's rules fall squarely into that "great in-
between." *Id*. at 91 (evaluating the effects of "restrictions in the NCAA's labor
market" involves "complex questions requiring more than a blink to answer"). To
invalidate a non-commercial eligibility rule like the Five-Year Rule under the "quick
look" standard turns the law on its head because it applies a lower standard of review
to a rule that deserves, if not an absolute presumption, then at least a far greater
presumption, of validity. This reasoning led the district court to hold, nonsensically,
that the Five-Year Rule and JUCO Bylaws are an even more direct restraint on trade
than the compensation rules addressed in *Alston*. (JA1125). But no careful economic
analysis was ever performed by the district court, as it only took a "quick look" at
the alleged economic effects.

In short, the district court erred by finding anticompetitive effects based on a
"quick look" review.

### ii. The District Court Engaged in Flawed Reasoning That Has No Limiting Principle

Different types of athletic competition create product variety, enhance
consumer choice, and ultimately increase output—whether it is NCAA men's
college football, women's professional basketball, the Paralympics, or the Senior
PGA Tour. These types of organizations derive their value precisely from exhibiting
competition that is limited to certain classes of people. *See, e.g.*, *Deesen v. Pro.*

*Golfers' Ass'n*, 358 F.2d 165, 172 (9th Cir. 1966); *Toscano v. PGA Tour, Inc.*, 201 F. Supp. 2d 1106, 1122-23 (E.D. Cal. 2002). If the ability of entities like the NCAA to offer a differentiated type of competition is eliminated, then competition and competitive opportunities suffer as a whole.

The District Court concluded that the Five-Year Rule is anticompetitive because it deprives some players of compensation that NCAA boosters and schools might otherwise be willing to pay whenever those players become ineligible. The District Court failed to appreciate the interdependent relationship between upstream eligibility rules for players (*i.e.*, inputs) and the downstream sports competitions between teams of those players (*i.e.*, products). Eligibility rules upstream define the type of sports competition that is being produced downstream. Eligibility rules thus create the parameters for upstream competition to supply inputs for the downstream "product" of athletic competition.

It is not a proper antitrust analysis to state simply that the exclusion of a class of otherwise qualified athletes creates a substantial anticompetitive effect.

First, and as noted above, any eligibility rule will, by definition, reduce the pool of participating players to those who are eligible and exclude those who are ineligible. The district court's opinion has no limiting principle. If applied rigorously, it would eliminate all eligibility rules. For this reason, many other

39

associations of colleges and universities have lent support to the NCAA in these cases:

> If affirmed, the court's injunction jeopardizes the NCAA's ability to effectively set and enforce nationwide eligibility rules for intercollegiate athletics....A patchwork of ad hoc rule adjustments and waivers granted by judges around the country—rather than by athletics conferences or the NCAA—will replace a nationwide system developed and implemented by the schools and their membership organizations. Federal courts will effectively become courts of appeals for the NCAA—often reviewing cases, as here, in an emergent posture on an underdeveloped record.

Brief Amicus Curiae of American Counsel on Education, et al. at 6, *Pavia v. NCAA*, No. 24-6153, ECF No. 21 (6th Cir. March 31, 2025)[13]; *see also Pavia*, 2025 WL 2787816, at *8 (Thapar, J., concurring) (noting that "[o]ver time, courts could become the de facto appeals body for eligibility determinations for over half a million student-athletes" and that judges should be "mindful of our limitations. We aren't good central planners and should never aspire to the role") (quotation omitted).

Second, the mere increase in the number of competitors does not necessarily imply an increase in competition in the relevant economic sense. *See Fourqurean*, 143 F.4th at 870-71 (plaintiff's theory of harm made no sense, because "[u]nder ordinary principles of supply and demand, a restraint that limits the supply of

---

[13] The District Court accorded deference to the amicus brief from the West Virginia Attorney General's Office but largely disregarded the Department of Justice's Statement of Interest, the President's Executive Order, and the Brief Amicus Curiae of American Counsel on Education.

workers in a labor market would increase, not decrease, worker compensation"); *Arbolida*, 2025 WL 579830, at *3 (finding the current eligibility rules "limit the total potential supply" but "seem to increase competition among the NCAA member institutions...for the limited supply of potential labor").

Third, changing eligibility rules upstream necessarily changes the competitive product being created downstream. Football performed by athletes who are not also college students is not "college football." *See Pavia*, 2025 WL 2787816, at *8 (Thapar, J., concurring) ("When courts decide who is qualified to participate in this great tradition, we implicate the line separating college athletics from professional athletics. Our intervention could have unknown consequences on the intangible benefits from college sports."). Courts and antitrust law do not exist for the purpose of deciding what types of products commercial actors must produce.

Here, the educational institutions that compose NCAA Division I have determined that only student-athletes who satisfy the Five-Year Rule, including its treatment of junior college enrollment as beginning a student's eligibility period, can produce NCAA sports. The NCAA's decision is not "anticompetitive" just because some people no longer meet the student-athlete eligibility requirements. The District Court erred when it re-wrote the NCAA's eligibility rules to give four players more eligibility.

### D.    The District Court Erred in Rejecting the NCAA's Procompetitive Justifications.

The District Court gave short shrift to the NCAA's procompetitive justifications for the Five-Year Rule. Indeed, its reasons for rejecting those justifications did not actually address the justifications themselves.

Unlike sports that are untethered from the educational experience (like professional sports), Division I eligibility rules maintain the link to a standard degree progression, while also ensuring that once student-athletes exhaust their allotted period of eligibility, new student-athletes are admitted and replace them—thereby having their own opportunity to enjoy the benefits of obtaining an education while playing college sports, including the benefits and compensation attendant upon doing so. This is important because, as explained above, Division I football opportunities are finite. As a result, if anything, the Five-Year Rule is likely to increase competition among those competing—and paying—for talented student-athletes. *Arbolida*, 2025 WL 579830, at *4 (D. Kan. Feb. 21, 2025) (observing that the "effect of the challenged rules is to increase competition, at least as between schools competing for talent in the student athlete labor market").

Contrary to the District Court's finding, the NCAA's product is not unique because it has "younger, less experienced athletes." Rather, it is unique because its athletes are students. Appellees were preparing to leave college after the -2024-25 school year to pursue careers in the NFL through the NFL Draft. They started playing

42

collegiate football *six and seven years ago*, were members of intercollegiate football teams, attempted to play intercollegiate football throughout those six or seven years, and intended for football to be their primary source of income.

Additionally, the fact that Division I schools accept *eligible* student-athletes through the transfer portal is not inconsistent with its aim to provide spots for new students. Transferring a student from one Division I school to another does not increase the total number of students who are eligible to play in Division I; rather, the student fills one spot at the new school, but the student's spot at his previous school opens up. Allowing transfer students to come from non-Division I schools also is not inconsistent with the goal of ensuring spots for younger players because that goal does not require *all* spots to go to *freshman*. Rather, the Five-Year Rule ensures that veteran players are phased out to make way for newer incoming players on a schedule that is roughly in line with normal undergraduate study—which in turn preserves the NCAA's unique product. Eligible transfers are students—as are those who took breaks for military service or religious obligations or who merely played some games against college teams while in prep school.

Because the District Court's reasons for rejecting the NCAA's procompetitive justifications for the Five-Year Rule do not actually address those justifications, the District Court erred.

## II.     The District Court Erred in Finding Irreparable Harm.

The District Court abused its discretion in concluding that Appellees would suffer irreparable harm and in finding so without adequately considering the delay caused by Appellees. (JA1136.) As an initial matter, Appellees' delay in seeking injunctive relief weighs against a finding of irreparable harm, and, of the growing number of challenges brought by NCAA athletes to these eligibility rules, Appellees demonstrate the largest delay in seeking judicial relief thus far. Although they have known of the expiration of their eligibility since the conclusion of the 2024 football season (and that JUCO years would count towards eligibility for far longer), Appellees did not file suit until shortly before commencement of the 2025-26 season. (JA657.) They created the purported emergency that served as the basis for their requested relief by waiting until the eve of the football season to file suit—the same could have been addressed much earlier in 2025 or in late 2024 to subvert such "emergency."

Plaintiff cannot manufacture irreparable harm by failing to timely file suit. *See Arbolida*, 2025 WL 579830, at *4 (denying TRO because plaintiff's alleged "injury is due in part to [p]laintiff's own actions in waiting to file the present suit" until "the day of his team's first game"); *Ciulla-Hall*, 2025 WL 438707, at *3 (noting that the "emergency circumstances...appear at least in part attributable to Ciulla-Hall's delay in seeking injunctive relief"); *Southtech Orthopedics, Inc. v. Dingus*, 428 F. Supp.

44

2d 410, 420 (E.D.N.C. 2006) (finding that a delay in filing suit of six to nine weeks weighs against injunctive relief). Plaintiff's delay prevents him from establishing a right to injunctive relief because it shows he had no "apprehension of irreparable harm." *Waff Bros, Inc. v. Bank of N. Carolina*, N.A., 289 N.C. 198, 204 (1976); *see also Northern Va. Hemp v. Virginia*, 700 F. Supp. 3d. 407, 427 (E.D. Va. 2023), vacated on other grounds, 125 F.4th 472 (4th Cir. 2025) (finding that a challenge filed seven months after the passage of a law "indicate[s] an absence of the kind of irreparable harm required to support a preliminary injunction."); *Southtech Orthopedics, Inc*., 428 F. Supp. 2d at 420 (finding that a delay in filing suit of six to nine weeks weighs against injunctive relief); *TK Elevator Corp. v. Drzewiecki*, No. CV RDB-25-0744, 2025 WL 776111, at *5 (D. Md. Mar. 11, 2025) ("Delay in filing for injunctive relief may weigh against a claim of irreparable harm."); *Potomatc Heritage Trail Ass'n, Inc. v. Dep't of Transp*., Civ. No. DLB-22-2482, 2022 WL 7051160, at *18 (D. Md. Oct. 11, 2022) ("The plaintiff's delay in seeking injunctive relief undermines their claims of irreparable injury.").

Courts have recently rejected untimely requests for injunctive relief in challenges to the NCAA's eligibility rules. In *Giles v. NCAA*, the court found that the plaintiff's delay in seeking an injunction against the Five-Year Rule warranted denial of his request:

> [Giles] was advised in June that he was not eligible. It is likely he
> understood the ramifications of the five-year Rule long before that. He
> did not file his complaint until July 9, 2025, after the start of the training
> season. He did not file his application for injunctive relief until two days
> later. The Court can draw two inferences, neither of which is conducive
> to the Court's exercise of its discretionary equitable powers. First, there
> is no immediacy for the grant of relief. Second, gamesmanship lies in
> his timing in order to create a sense of urgency. The application for
> injunctive relief was filed late on a Friday afternoon after preseason
> practice had begun. Those who seek equity must do equity.

No. 8:25-cv-01488-JVS-KES, ECF No. 13, at 2 (C.D. Cal. July 17, 2025) (citations

omitted); *see also Bellamy*, 2025 U.S. Dist. LEXIS 152042, at *18-19; *Walker v.*

*NCAA*, 2025 WL 1901907, at *17-18 (M.D. La. July 1, 2025) (finding "multi-year

delay" based on plaintiff's execution of student-athlete statement years prior);

*Arbolida v. NCAA*, 2025 WL 579830, at *12 (denying the motion for temporary

restraining order because plaintiff's alleged injury "is due in part to [p]laintiff's own

actions in waiting to file the present suit" until "the day of his team's first game");

*Ciulla-Hall*, 2025 WL 438707, at *8-9 (noting that the "emergency

circumstances...appear at least in part attributable to Ciulla-Hall's delay in seeking

injunctive relief").

Courts also recently considered a student-athlete's delayed pursuit of

injunctive relief. *See, e.g.*, *Jones v. NCAA*, 2025CVS3492, at ¶ 60 (N.C. Sup. Ct.

2025). In *Jones*, the court found that "[a]fter burning their redshirt opportunities,

[the plaintiffs knew] that they were heading towards exhaustion of their four years

of eligibility under the Bylaws since approximately 2021, as they apparently reminded themselves and their coaches at various times. For at leas[t] months...and years..., [the plaintiffs knew] that, to gain an additional year of eligibility, they would need waivers of, or exceptions to, the Bylaws that they now challenge." *Id.* at ¶ 60. The Court stated that "[a]s in other cases where motions for restraining orders and preliminary injunctions have been denied, much of the alleged irreparable harm of which [the plaintiff's] complain—a quickly approaching decision deadline concerning the NFL draft and an inability to play football in the fall of 2025—was avoidable, or at least could have been mitigated, had [the plaintiffs] acted sooner." *Id*. at ¶ 62. "[L]engthy delays counsel heavily against a finding of irreparable harm." *Smith et. al v. Nat'l Collegiate Athletic Ass'n,* 2025 NCBC 24 at ¶ 65 (N.C. Sup. Ct. 2025) (finding a one-month delay defeats a claim of irreparable harm) (citing *Glob. Textile All., Inc. v. TDI Worldwide, LLC*, 2017 NCBC LEXIS 108, at *11 (N.C. Super. Ct. Nov. 21, 2017) ("One significant measure of … immediate and irreparable harm is the haste with which the moving party seeks injunctive relief." (citations omitted)); *N. Iredell Neighbors for Rural Life v. Iredell Cnty*., 196 N.C. App. 68, 79 (2009) (affirming denial of injunction pending appeal where "some two months" passed "without any contention by plaintiffs of an urgent threat of irreparable harm"); *W&W Partners, Inc. v. Ferrell Land Co.*, 2018 NCBC LEXIS 210, at *12 (N.C. Super. Ct. Mar. 8, 2018) (plaintiffs waited eight months after learning of

underlying dispute before filing suit); *Am. Air Filter Co. v. Price*, 2017 NCBC LEXIS 9, at *13-15 (N.C. Super. Ct. Feb. 3, 2017) (denying preliminary injunction after four-month delay); *see also Jones*, 2025CVS3492 at ¶ 61.

The court below seeks to justify the delay based on the fact that at least two of Appellees had pending waivers until June 2025. [JA1137]. However, nothing precluded Appellees from seeking remedy from the courts simultaneously to the waiver process. The court in *Boyd* addressed this very issue when the NCAA made the exact same argument:

> The NCAA points to Bylaw 12.7.2.1, which requires student-athletes to submit a signed statement that provides information related to eligibility and to acknowledge that they are "responsible for knowing and understanding the application of all NCAA Division I regulations related to [their] eligibility." Defendant argues that the three-year delay shows any urgency to Boyd's request for preliminary injunction is of his own making and that his assertion of lost opportunity to play professionally is speculative, at best.... The Court agrees Boyd has shown irreparable harm, but finds this showing is tempered by the delay in seeking relief. ***To be sure, his perception of the value of a season of play may have evolved since he began his Division I career, but the failure to seek redress until now suggests a lack of urgency for relief.*** *See* 11A Charles A. Wright, Arthur R. Miller, et al., Federal Practice and Procedure § 2948.1 (3d ed. 2018) ("A long delay by plaintiff after learning of the threatened harm also may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction.").

*Boyd v. NCAA*, No. 3:25-CV-00729, 2025 WL 2432200, at *9 (M.D. Tenn. Aug. 22, 2025) (emphasis added) (finding that preliminary injunctive relief was not an appropriate remedy for a similarly situated athlete).

Appellees also cannot establish irreparable harm because the injuries they claim are fully redressable with money damages, or are too speculative to support issuance of an injunction. To establish irreparable harm, Plaintiff "must make a clear showing that [he] will suffer harm that is neither remote nor speculative, but actual and imminent." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 (4th Cir. 2019) (internal quotations and citation omitted). "[T]he harm must be irreparable, meaning that it cannot be fully rectified by the final judgment after trial." *Id.* (internal quotations and citation omitted).

The vague and hypothetical lost opportunities Plaintiff alleges do not constitute evidence of irreparable harm. "Any injury which the plaintiff might suffer to his professional football career if the injunction is not granted is speculative at best." *Kupec v. Atl. Coast Conference*, 399 F. Supp. 1377, 1379 (M.D.N.C. 1975). In *Kupec*, the plaintiff contended that he would "suffer great injury to his professional football career if the injunction [were] denied because another year of eligibility would allow professional football scouts to see him in action once more." *Id*. The court found that injury to be too speculative to grant a preliminary injunction. However, the court went a step further by finding that, even if such injury was sufficient under the standard, the harm to the ACC would greatly outweigh any such injury to the plaintiff:

> [E]ven assuming that the plaintiff would somehow be injured, the harm which would be done to the Atlantic Coast Conference (ACC) should

49

the injunction be granted heavily outweighs any injury to the plaintiff. The ACC is a voluntary association of colleges and universities whose goal is basically to regulate university athletics and, hopefully, to keep university athletics from becoming professionalized to the extent that profit making objectives would overshadow educational objectives. In pursuance of its goals, the ACC prescribes standards which must be followed by student athletes and their schools. An injunction would have the effect of usurping the regulatory authority of the ACC and substituting for it the judgment of this Court. Such an action would decrease respect for the ACC's authority and its ability to adequately regulate university sports would thereby be weakened. Thus, the ACC will suffer harm if the injunction is granted far in excess of any harm suffered by the plaintiff if it is not.

*Id.*; *see also McGee v. Virginia High Sch. League, Inc.*, 801 F. Supp. 2d 526 (W.D. Va. 2011) (holding that prevention from participating in interscholastic athletics is not irreparable harm).

Other courts have similarly held that a failure to meet eligibility requirements does not constitute irreparable harm. *See, e.g.*, *Sharon City Sch. Dist. v. PIAA*, No. CIV.A. 9-213, 2009 WL 427373, at *2 (W.D. Pa. Feb. 20, 2009) (opining that "it is well established that ineligibility for participation in interscholastic athletic competitions alone does not constitute irreparable harm"); *Dziewa v. Pennsylvania Interscholastic Athletic Ass'n*, No. CIV.A. 08-5792, 2009 WL 113419, at *7 (E.D. Pa. Jan. 16, 2009) (no irreparable harm where high school wrestler was ineligible to participate in wrestling season due to bylaw regarding school transfers).[14]

---

[14] The District Court provided a misguided analysis and application of the *Ohio* case as the Title IX issues in that matter make them substantial distinguishable from the case at bar. *Ohio* cites six authorities as support for its finding that "the denial of the opportunity to play sports is irreparable harm." 706 F. Supp. 3d at 597. Each of these decisions involve female student-athletes' statutory rights under Title IX to the same opportunity to participate in collegiate

Therefore, any alleged harm by Appellees for missing another season is: (1) redressable; or (2) too speculative to support a finding of irreparable harm such that a preliminary injunction was necessary. To find otherwise constitutes an error by the District Court.

## III.    The Balance of the Equities in favor of Appellees.

The District Court further erred in its finding that Appellees were likely to suffer more substantial, immediate, and irreparable harm than the NCAA. (JA1140.) Notably, the District Court did not spend much time with this analysis and failed to even acknowledge that granting Appellees' injunction would disrupt the collegiate experiences and opportunities for tens of thousands of prospective and current student-athletes. Regardless, this issue was likewise addressed by the *Pavia* district court judge in *Boyd*:

> …[T]he bulk of the asserted harm is loss of access to the substantial NIL opportunities, which is monetary harm that can be redressed at a later stage. Allowing Boyd another season of eligibility will almost certainly come at the expense of another eligible player. Finally, although the Court has recognized that "the public interest is served by promoting free and fair competition in the labor markets", as the requested relief affects only Boyd, this factor does not weigh heavily in the Court's consideration.

---

athletics as male student-athletes. *Id.* Neither *Ohio* nor the authorities cited therein found that the exhaustion of a student athlete's eligibility under longstanding NCAA bylaws constitutes a denial of the opportunity to participate in collegiate athletics. *Ohio* is also distinguishable insofar as this Court, in explaining that the lost ability to participate in college sports evidences irreparable harm, relied upon the premise that the interruption of one's eligibility presents a unique harm  because student-athletes' eligibility is limited by the Five-Year Rule. *Id.* at 592 n.3. Here, unlike the plaintiffs in *Ohio*, Plaintiffs are not losing a year of eligibility to which they would otherwise be entitled; they are claiming harm from not being permitted additional time.

*Boyd*, 2025 WL 2432200, at *10 (citations omitted) (citing *Zeigler*, 2025 WL 1671952, at *5 ("given the fixed number of roster spots available for each Division I basketball team, an injunction would run the risk of harming (1) currently-enrolled Division I basketball players who have already committed to a member institution and (2) current high school seniors who might have their college recruitment disrupted")).

Further, even if this Court were to find in favor of Appellees on the likelihood of success and irreparable harm, the cost of a preliminary injunction to the remainder of those players in the NCAA greatly outweighed the hypothetical benefits to Appellees. *See Coley*, 2025 WL 1616719, at *10 ("[T]he balance of hardships does not favor Coley. Granting Coley's request would upend the NCAA's Division I Bylaws and affect 'over 180,000' Division I student-athletes in 'multiple sports.'...Moreover, Coley has offered little evidence beyond his own experience to support his request for an extraordinary, mandatory preliminary injunction. On this limited record, Coley fails to meet the high bar required to upend the status quo with the entry of an extraordinary, mandatory preliminary injunction.").

Every time a student-athlete receives an additional year of eligibility, it takes away that opportunity from another incoming student-athlete. And over time, this dilutes the NCAA's product, collegiate athletic competition, entirely.

52

## <u>CONCLUSION</u>

The District Court's order awarding a preliminary injunction should be reversed given that Appellees cannot demonstrate a likelihood of success on the merits and delayed in seeking a remedy from the Courts.

Dated:  October 27, 2025.

Respectfully submitted,

By: */s/ Nishma Patel*
**Thomas R. Woodrow**
NC Bar No. 58622
**Nishma Patel**
NC Bar No. 50922
**HOLLAND & KNIGHT LLP**
1120 S. Tryon Street, Suite 900
Charlotte, North Carolina 28203
Phone 980.215.7797
Fax 980.215.7771
tom.woodrow@hklaw.com
nishma.patel@hklaw.com

**J. Douglas Minor, Jr.**
**HOLLAND & KNIGHT LLP**
1180 West Peachtree Street, NW
Suite 1800
Atlanta, Georgia 30309
(404) 817-8500 (phone)
(404) 881-0470 (fax)
doug.minor@hklaw.com

**Benjamin L. Bailey (WVSB No. 200)**
**Christopher D. Smith (WVSB No. 13050)**
**BAILEY & GLASSER, LLP**
209 Capitol Street
Charleston, West Virginia 25301
(304) 345-6555 (phone)

(304) 342-1110 (fax)
bbailey@baileyglasser.com
csmith@baileyglasser.com

*Counsel for National Collegiate Athletic Association*

## <u>COMBINED CERTIFICATIONS</u>

I certify that:

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). This brief contains 12,938 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.

2.      This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because it has been prepared in a 14-point proportionally spaced typeface (Times New Roman) using Microsoft Word.

3.      On October 27, 2025, I caused the foregoing to be filed with the Clerk of Court using the CM/ECF System.

Date: October 27, 2025

                                        */s/ Nishma Patel*
                                        Nishma Patel