IN THE

# United States Court of Appeals
# for the Fourth Circuit

---

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,

*Defendant-Appellant,*

*vs.*

JIMMORI ROBINSON, et al.,

*Plaintiffs-Appellees.*

---

*On Appeal from the United States District Court*
*for the Northern District of West Virginia, No. 1:25-cv-95 (Bailey, J.)*

---

**RESPONSE BRIEF OF PLAINTIFF-APPELLEES**

---

*Counsel for* Plaintiff-Appellees

John F. Gianola
Lewis Gianola PLLC
300 Summers St., Suite 700
Charleston, West Virginia 25301
(304) 345-2000
john.gianola@lewisgianola.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ ii

STATEMENT OF ISSUES ........................................................................1

STATEMENT OF CASE ...........................................................................1

SUMMARY OF ARGUMENT .....................................................................4

ARGUMENT ..........................................................................................6

I.    The World Has Turned and Left the NCAA Here. ....................................6

II.   The NCAA Simply Seeks to Re-Litigate the Preliminary Injunction. ...12

    A.    The NCAA's Argument is Based on the Wrong Standards. ..................12

    B.    The District Court's Preliminary Injunction Was Proper.......................16

        a.    The Five-Year Rule is Subject to Antitrust Scrutiny. ..........................16

        b.    The District Court Properly Defined the Market. ................................19

        c.    The 5-Year Rule is By Its Very Nature Anticompetitive. .....................21

        d.    There Are No Procompetitive Justifications for the 5-Year Rule. .........25

        e.    The Players Would Be Irreparably Harmed Without This Preliminary
              Injunction. ..............................................................................27

        f.    The Balance of Equities Favors the Players. .........................................32

        g.    The Public Interest Favors the Players...................................................34

    III.   Conclusion............................................................................................35

    STATEMENT REGARDING ORAL ARGUMENT ............................................A

# TABLE OF AUTHORITIES

**Cases**

*A.A.R.P. v. Trump,* 605 U.S. 91(2025) ....................................................15

*Anderson v. Bessemer City*, 470 U.S. 564 (1985).....................................13

*Arbolida v. NCAA,* 2025 WL 579830 (D. Kan. Feb. 21, 2025)..............................27

*Bassett v. NCAA,* 528 F.3d 426 (6th Cir. 2008).....................................18

*Battle v. NCAA,* Civil Action No. 1:23-cv-101 (N.D.W. Va. Dec. 13, 2023)
    (accessible via PACER). ....................................................30

*Biediger v. Quinnipiac Univ.*, 616 F. Supp. 2d 277 (D. Conn. 2009) ....................31

*Braham v. NCAA,* Civil No. 3:25-cv-253, 2025 U.S. Dist. LEXIS 137047,
    2025 WL 2017162, (E.D. Nev. July 18, 2025) ....................................20

*Brooks v. State Coll. Area Sch. Dist.*,
    643 F. Supp. 3d 499 (M.D. Pa. Dec. 1, 2022) ....................................31

*Business Elec. Corp. v. Sharp. Elec. Corp*., 485 U.S. 717 (1988) ........................24

*Centro Tepeyac v. Montgomery Cnty.,* 722 F.3d 184 (4th Cir. 2013)....................14

*Doe v. Portland Pub. Sch.,* 701 F.Supp.3d 18 (D. Me. 2023) ................................31

*Dziewa v. Pennsylvania Interscholastic Athletic Ass'n*,
    Civil Action No. 08-5792, 2009 U.S. Dist. LEXIS 3062,
    2009 WL 113419 (E.D. Pa. Jan. 16, 2009) ........................................31

*E.C. Knight* 156 U.S. 1 (1895)................................................18

*Eastman Kodak Co. v. Image Technical Servs.*, 504 U.S. 451 (1992) ...................19

*Elad v. NCAA,* Civil Action No. 3:25-cv-1981, 2025 U.S. Dist. LEXIS 78922,
    2025 WL 1202014 (E.D.N.J. April 25, 2025)......................................20

*Federal Baseball Club* 259 U.S. 200 (1922) ...........................................................18

*Fourqurean v. NCAA*, 143 F.4th 859 (7th Cir. 2025).........................................5, 34

*G.G. v. Gloucester Cnty. Sch. Bd.,* 822 F.3d 709 (4th Cir. 2016) ........ 12, 13, 15, 16

*IGT v. Alliance Gaming Corp.*, 702 F.3d 1338 (Fed. Cir. 2012)...........................19

*In re Coll. Athlete NIL Litig.*, No. 20- cv-03919, 2025 U.S. Dist. LEXIS 113799,
    2025 WL 1675820 (N.D. Ca. June 6, 2025) ................................................ *passim*

*League of Women Voters of N.C. v. North Carolina*,
    769 F.3d 224 (4th Cir. 2014) ......................................................................... 12, 13

*Mayerova v. E. Mich. Univ.*, 346 F. Supp. 3d 983 (E.D. Mich. 2018)...................31

*McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*,
    370 F.3d 275 (2d Cir. 2004) ..................................................................................31

*Morris v. Wachovia,* 448 F.3d 268 (4th Cir. 2006) ................................................13

*Mt. Valley Pipeline, LLC v. 6.56 Acres,* 915 F.3d 197 (4th Cir. 2019) .................13

*Navarro v. Fla. Inst. of Tech., Inc.*, No. 6:22-cv-1950, 2023 U.S. Dist. LEXIS 27519,
    2023 WL 2078264 (M.D. Fla. Feb. 17, 2023).......................................................31

*NCAA v. Alston*, 594 U.S. 69 (2021) .............................................................. *passim*

*NCAA v. Board of Regents,* 468 U.S. 85 (1984) ............................................... 11, 20

*O'Bannon v. NCAA*, 802 F.3d 1049 (9th Cir. 2015).................................................7

*Pashby v. Delia*, 709 F.3d 307 (4th Cir. 2013).......................................................13

*Pavia v. NCAA*, 760 F.Supp.3d 527 (M.D. Tenn. 2024) ................................ 8, 9, 20

*Portz v. St. Cloud State Univ.*, 401 F.Supp.3d 834 (D. Min. 2019) .......................31

*Revesz v. Pa. Interscholastic Ath. Ass'n, Inc.,*
    798 A.2d 830 (Commonwealth Court of Pa. May 21, 2002) ..............................31

*S.A. v. Sioux Falls Sch. Dist. 49-5,* No. 4:23-CV-04139,
    2023 U.S. Dist. LEXIS 185464, 2023 WL 6794207 (D.S.D. Oct. 13, 2023)......31

*Sanchez v. NCAA,* 2025 U.S. Dist. LEXIS 37500,
    2025 WL 684271 (E.D. Tenn. Mar. 3, 2025).....................................................18

*Sharon City Sch. Dist. v. PIAA,* Civil Action No. 9-213,
    2009 U.S. Dist. LEXIS 13037, 2009 WL 427373 (W.D. Pa. Feb. 20, 2009)......31

*Univ. of Tex. v. Camenisch,* 451 U.S. 390 (1981) ..................................................15

*USA Farm Lab, Inc. v. Micone,* 2025 U.S. App. LEXIS 4200,
    2025 WL 586339 (4th Cir. Feb. 24, 2025).......................................................14

*Walton v. Johnson*, 440 F.3d 160 (4th Cir.)...........................................................13

**Other Authorities**

Antitrust Law: An Analysis of Antitrust Principles and Their Application (CCH)
    260b ..............................................................................................................18

NCAA Bylaw § 12.8 ................................................................................. 1, 8, 9

NCAA Bylaw § 12.11.4.2 ...............................................................................1

NCAA Bylaw § 14.5.4.3 ...............................................................................8

Roger D. Blair & Jeffrey L. Harrison,
    Monopsony in Law and Economics (2010) ........................................................5

# STATEMENT OF ISSUES

The Plaintiff-Appellees (hereinafter the "Players") do not generally disagree with the NCAA's statement of the issues presented for review, but disagree that the issues, presented in the form of questions, should be answered in the affirmative. The Players obviously believe the District Court did not err or fail to make legally sufficient findings in granting the preliminary injunction. The Players also note that the NCAA did not present to this court for review portions of the District Court's order enjoining enforcement of the NCAA's Rule of Restitution (NCAA Bylaw § 12.11.4.2) against Jimmori Robinson, Jeffrey Weimer, Tye Edwards, Justin Harrington and/or West Virginia University for complying with, and relying on, the District Court's order and assume, therefore, that the NCAA has waived that issue and does not wish for it to be further litigated.

# STATEMENT OF CASE

The Players likewise do not generally disagree with the NCAA's statement of the case, but believe that the NCAA's portrayal of the Player's collegiate career suggests that they have spent more time in college and more time playing college sports than they really have.

This case is about the NCAA's "Five-Year Rule" (sometimes called the "Clock") and its relationship to Players who attend Junior College. Under the NCAA Bylaw § 12.8 "Seasons of Competition: Five-Year Rule," players have five

years to participate in four seasons of athletic competition. JA135-145. Four football players who had enrolled at West Virginia University after playing for various other institutions sought affirmation that they were indeed eligible to continue their college football careers. JA6.

As acknowledged in Appellant's Brief, in December 2024, the NCAA announced a waiver that seasons playing sports in Junior College did not apply towards the NCAA's four seasons of athletic competition limit.[1] However, through a twist of fate, the Players learned that even though they had played fewer than four season at NCAA institutions and that the waiver seemingly allowed (or acknowledged) their ability to compete, the *time* they were in school somehow did count against the Five-Year Rule and the NCAA considered them ineligible. JA560-564.

Plaintiffs' playing career prior to filing their lawsuit is briefly summarized in the tables below. The highlighted years are the years in which the Players competed in NCAA-sanctioned athletics.

**Jimmori Robinson**

| *Year* | *College* | *Played Football?* |
|--------|-----------|--------------------|
| 2019-2020 | Dodge City Comm. College | Yes (non-NCAA) |
| 2020-2021 | Monroe University | No (COVID) |

---

[1] Appellant's Brief (pp. 8-12) appears, however, to count seasons of athletic competition in Junior College towards this limit.

2

| 2021-2022 | UTSA | No (Redshirt) |
| 2022-2023 | UTSA | Yes (NCAA) |
| 2023-2024 | UTSA | Yes (NCAA) |
| 2024-2025 | UTSA | Yes (NCAA) |

## Jeff Weimer

| *Year* | *College* | *Played Football?* |
| --- | --- | --- |
| 2018-2019 | Hartnell College | Yes (non-NCAA) |
| 2019-2020 | Hartnell College | No (Redshirt) |
| 2020-2021 | City College of SF | No (COVID) |
| 2021-2022 | City College of SF | Yes (non-NCAA) |
| 2022-2023 | UNLV | Yes (NCAA) |
| 2023-2024 | Not enrolled | No |
| 2024-2025 | Idaho State | Yes (NCAA) |

## Tye Edwards

| *Year* | *College* | *Played Football* |
| --- | --- | --- |
| 2019-2020 | Georgia Military College | Yes (non-NCAA) |
| 2020-2021 | Hutchinson Community College | Limited[2] |
| 2021-2022 | Hutchinson Community College | Yes (non-NCAA) |
| 2022-2023 | UTSA | No (Redshirt) |
| 2023-2024 | Northern Iowa | Yes (NCAA) |
| 2024-2025 | Northern Iowa | Yes (NCAA) |

---

[2] There was no fall 2020 football season at Hutchinson Community College, but in the spring of 2021, a limited voluntary season was held that does not count towards eligibility.

**Justin Harrington**

| Year | College | Played Football |
|------|---------|-----------------|
| 2018-2019 | Bakersfield Comm. College | Yes (non-NCAA) |
| 2019-2020 | Bakersfield Comm. College | Yes (non-NCAA) |
| 2020-2021 | Oklahoma | No (Redshirt) |
| 2021-2022 | Oklahoma | No (Redshirt) |
| 2022-2023 | Oklahoma | Yes (NCAA) |
| 2023-2024 | Oklahoma | No (Redshirt) |
| 2024-2025 | Washington | Yes (NCAA) |

The Players then sought relief through the NCAA's individualized waiver system, but were denied. JA1169-1170. They then sought relief from the court system to prevent themselves from being irreparably harmed. JA6. The district court recognized that the Players were likely to succeed at trial, and granted its preliminary injunction. JA1097-1163. The NCAA now appeals that preliminary injunction.

## SUMMARY OF ARGUMENT

The NCAA refuses to admit that times have changed. Student-athletes can now profit from their name, image, and likeness ("NIL"). Recent developments also mean that student-athletes can share in the revenue generated by college sporting events. These have massive implications for the NCAA's monopsony[3] of the college

---

[3] A monopsony is a condition in which a buyer in a market has sufficient power to affect market prices. It is widely acknowledged that the NCAA exercises

student-athlete labor market and essentially rewrite many prior held beliefs. In light of that, and in light of the review of the law and evidence before it, the District Court did not abuse its discretion when issuing the preliminary injunction in this matter.

The NCAA's appeal appears to be little more than an attempt to re-litigate the injunction and seems to implicitly ask this Court to rewrite its traditional standard of review for a preliminary injunction. But this Court's jurisprudence acknowledges and accepts that preliminary injunctions may be based upon hearsay or other non-admissible evidence and will only overturn a preliminary injunction when it constitutes an abuse of discretion. So long as the District Court's account of the evidence is *plausible* in light of the record viewed in its entirety and the court demonstrated a firm grasp of the legal principles pertinent to the underlying dispute, a preliminary injunction should not be overturned.

---

monopsony power in the market for college student-athlete labor. *Fourqurean v. NCAA*, 143 F.4th 859, 870 (7th Cir. 2025) (quoting *NCAA v. Alston*, 594 U.S. 69, 81 (2021)).

The NCAA exercises its power in that market by "act[ing] as a buyer cartel or a collusive monopsony. Under the auspices of the NCAA, the member institutions collude to reduce competition among themselves in an effort to reduce costs and thereby generate more 'profit' for their athletic programs. Examples of collusive monopsony can be found throughout the country, but the NCAA is a particularly good example." Roger D. Blair & Jeffrey L. Harrison, Monopsony in Law and Economics (2010, p. 189).

In view of the appropriate standard of review, there is no basis to overturn or dissolve this preliminary injunction. The District Court correctly identified and defined the market for college student-athlete labor, a market well-recognized in both antitrust legal commentary and in multiple other court cases. The restriction in question is a blatant and admitted restriction on access to that market, meaning the NCAA must provide a pro-competitive rationale for it. The NCAA failed to do so. It offers no evidence on that point and cannot distinguish the restrictions it seeks to enforce with numerous other exceptions and waivers that circumvent it. Finally, the Players showed at the lower level that they were irreparably harmed by the NCAA's irrational restriction of their participation in that market and that the balance of equites weighed in their favor.

For those reasons, the District Court's preliminary injunction was not an abuse of discretion and should not be overturned or dissolved.

## ARGUMENT

## I. The World Has Turned and Left the NCAA Here.

Underlying this entire case is the simple, unavoidable fact that the NCAA is living in a world that no longer exists. Since the U.S. Supreme Court's decision in *NCAA v. Alston* (594 U.S. 69), student-athletes, such as the Players here, have been

able to earn income by licensing their name, image, and likeness ("NIL").[4] *See also O'Bannon v. NCAA*, 802 F.3d 1049 (9th Cir. 2015). Even while *Alston* was being litigated, another lawsuit regarding student-athlete compensation was pending against the NCAA: *House v. NCAA*, a class-action in which the plaintiffs sought to prohibit the NCAA from imposing restrictions on college-athlete compensation and athletic scholarships. *See In re Coll. Athlete NIL Litig.*, No. 20- cv-03919, 2025 U.S. Dist. LEXIS 113799, 2025 WL 1675820, *15 (N.D. Ca. June 6, 2025) (hereinafter "*House*"). On June 6, 2025, the *House* court approved a settlement between the NCAA and class members that resulted in billions of dollars in damages for class members and "ground-breaking changes in NCAA rules that govern student-athlete compensation," some of which now "enable NCAA schools to share their athletic revenues with Division I college student-athletes for the first time in the history of the NCAA…." *Id*. at *16.

The NCAA—long a bastion of amateur athletics—surely feels embattled. And so it clings to whatever rock it can grasp. But as may be expected, such desperate measures may not always be the most rational and the purchase sought may exceed the grasp. Such is the case here, where the NCAA now seeks to appeal an injunction against the enforcement of an irrational and non-sensical penalty that

---

[4] This, of course, came only after antitrust lawsuits against the NCAA which had previously forbade student-athletes from earning such income.

serves no purpose but to arbitrarily restrict access to the student-athlete labor market by those who have found themselves for one reason or another attending non-NCAA institutions. The irony cannot be overstated: the NCAA here seeks to enforce its "JuCo Penalty," a collection of rules[5] that penalize student-athletes for nothing more than attending Junior College[6] (hereinafter "JuCo") prior to attending NCAA institutions. Its myriad of excuses as to why this penalty should not be enjoined make no sense. This penalty, for example, would not apply had these Players *not* attended junior college but merely waited to attend NCAA institutions, regardless of whether they also played amateur athletics. This is especially true now that the NCAA has decided that the *athletic seasons* played in JuCo do *not* count towards NCAA eligibility, granting a "blanket waiver" of such seasons against the NCAA's prior four-season limit. *See, e.g.,* Appellant Br. at 13 (referring to "*Pavia* waiver").[7]

---

[5] NCAA rules, such as Bylaw § 12.8.1 (the "Five-Year Rule") and Bylaw § 14.5.4.3 ("Academic Redshirt") that, along with their administration, discourage players from attending non-NCAA institutions and punish those who do.

[6] "Junior College" and "JuCo" are used herein as a shorthand for non-NCAA institutions that offer college sports. The JuCo Penalty affects these institutions equally.

[7] Because of the terminology used below and in news media covering these events this brief uses the terms "*Pavia Waiver*" and "blanket waiver" interchangeably. The term "*Pavia Waiver*" comes from the decision in *Pavia v. NCAA*, 760 F.Supp.3d 527 (M.D. Tenn. 2024).

This case, then, turns on the "Five-Year Rule" (sometimes called the "Clock"). Under the NCAA Bylaw § 12.8 "Seasons of Competition: Five-Year Rule," players have five years to participate in four seasons of athletic competition. JA135-145. While there are a number of exceptions to this rule and to which years count towards a player's "clock," the clock generally begins ticking as soon as a player enrolls in a "collegiate institution."

On December 18, 2024, the U.S. District Court for the Middle District of Tennessee granted Diego Pavia, the quarterback for the Vanderbilt University football team, an injunction, preventing the NCAA from denying him eligibility based upon his past athletic career in junior college. *Pavia v. NCAA*, 760 F.Supp.3d 527 (M.D. Tenn. 2024). Five days later, "[t]he NCAA Division I Board of Directors…approved a blanket waiver granting an additional year of eligibility to former junior college transfers in similar positions to…Pavia, opening the door for a wave of college athletes across all sports to spend one more year in college athletics."[8]

The announcement caused chaos, as some players—including the Players here—chose to remain in college rather than pursue careers in the National Football League ("NFL"). But there was a catch in the NCAA's waiver; a catch that many

---

[8] Eli Lederman, NCAA grants waiver to ex-JUCO players while appealing Pavia ruling, ABC News (December 24, 2024), https://abcnews.go.com/Sports/ncaa-grants-waiver-juco-players-appealing-pavia-ruling/story?id=117079035

did not notice, probably because it made no sense.  Irrationally the "blanket waiver" applied only to seasons of athletic competition, *not* to the limits imposed by the Five-Year Rule.  By the NCAA's own admission, the confusion surrounding the "blanket waiver" following the *Pavia* decision spurred dozens of lawsuits on the issue. JA1184-1185.

The NCAA now faces a mess of its own making.  Across the country student-athletes have sued, seeking to not be arbitrarily barred from participating in NCAA sports because of accidents of time and a blanket waiver that was not much of a blanket, applying to seasons of competition but not years of schooling.  And given the new world in which college sports lives, a world where student-athletes are allowed to benefit from not just licensing their name, image, and likeness, but also to directly share in college sports' massive revenue.  The irrational exclusion of these student-athletes serves no purpose but to suppress participation and benefit NCAA member universities.

The simple fact is that many of the precedents cited by the NCAA must be viewed in a new light, especially since the *House* settlement, which allows student-athletes to directly share in the revenue they help generate.  *House*, 2025 U.S. Dist. LEXIS at *37.  Even if you believed prior to the *House* settlement that eligibility and other similar rules were completely non-commercial, that analysis no longer necessarily holds.  Playing sports at an NCAA institution now also means a Player

will participate in the revenue generated by NCAA sporting events, activity that has long been held to be subject to antitrust scrutiny. *See, e.g., NCAA v. Board of Regents,* 468 U.S. 85 (1984). The District Court below pointed out this very issue to the NCAA: "Moreover, eligibility is even more commercial now that the settlement has been approved in *In re College Athlete NIL Litigation*, 2025 WL 1675820 (N.D. Cal. June 6, 2025) (Wilken, J.)." JA1119.

So while many may pine for the "old days," the days in which the NCAA could prevent student-athletes from participating economically in college sports are long gone. To the student-athlete whose family could not afford to feed their dog every day, this is obviously a good thing. To the fan who fondly remembers a pure amateurism of times gone by, perhaps this is a sad development. Regardless of how one views it, however, it is reality. At least to all but the NCAA; the world has apparently turned and left the NCAA here: grasping for something, anything in order to show that they can still control the economic lives of student-athletes. But that pining, grasping, demanding to go back to a different time is no basis for legal decisions. Instead, just as the District Court did below, this case calls for careful and rational analysis reflecting the realities of today rather than the world of old and courts' decisions then based upon the realities of their time.

## II. The NCAA Simply Seeks to Re-Litigate the Preliminary Injunction.

Like a microcosm of its desire to the turn back the clock on student-athlete compensation, the NCAA's appeal is little more than an attempt to re-litigate the preliminary injunction issued below. That, however, is not the standard of review for preliminary injunctions. Though paying lip service to Fourth Circuit precedents, the NCAA appears to implicitly ask this court to depart from the abuse of discretion standard of review that this court has espoused. Instead the NCAA asks that this Court weigh directly in on evidentiary disputes from the District Court's hearing and rather nakedly asks this court to simply side with other district courts (in other circuits) that ruled in the NCAA's favor.

### A. The NCAA's Argument is Based on the Wrong Standards.

A district court's issuance of a preliminary injunction is reviewed for abuse of discretion. *G.G. v. Gloucester Cnty. Sch. Bd.,* 822 F.3d 709, 724 (4th Cir. 2016) (vacated and remanded for other reasons, citing *League of Women Voters of N.C. v. North Carolina,* 769 F.3d 224, 236 (4th Cir. 2014)). Legal conclusions are reviewed *de novo,* but factual issues are reviewed for clear error. *League of Women Voters*, 769 F.3d at 235 (quoting *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013). In order for a preliminary injunction to qualify as abuse of a district court's discretion, it must be guided by erroneous legal principles or rest upon a clearly erroneous

factual finding. *Gloucester Cnty. Sch. Bd.,* 822 F.3d at 724 (citing *Morris v. Wachovia,* 448 F.3d 268, 277 (4th Cir. 2006)).

In reviewing a preliminary injunction, the task is not for the appellate court to "ask whether [it] would have come to the same conclusion as the district court if [it] were examining the matter *de novo*" but rather only to ask if issuing the preliminary injunction was an abuse of discretion because there is "…a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *Id.* Indeed, "abuse of discretion is a deferential standard" and "so long as the district court's account of the evidence is *plausible* in light of the record viewed in its entirety, [an appellate court] may not reverse even if [the appellate court] is convinced that [it] would have weighted the evidence differently." *Mt. Valley Pipeline, LLC v. 6.56 Acres,* 915 F.3d 197, 213 (4th Cir. 2019) (internal quotations omitted, but quoting *Walton v. Johnson*, 440 F.3d 160, 173 (4th Cir.) (en banc) [itself quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573-74 (1985)]). "If the district court applied a correct preliminary injunction standard, made no clearly erroneous findings of material fact, and demonstrated a firm grasp of the legal principles pertinent to the underlying dispute, no abuse of discretion occurred." *USA Farm Lab, Inc. v. Micone,* 2025 U.S. App. LEXIS 4200, 2025 WL 586339, *9-10 (4th Cir. Feb. 24, 2025) (internal quotation omitted, but

quoting *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 192 (4th Cir. 2013) (en banc)).

The NCAA seeks to deviate from this standard of review because it seeks to hold student-athletes to an evidentiary standard that is simultaneously onerous and erroneous.[9] Woven throughout the NCAA's argument is the idea that college students seeking preliminary injunction should be required to litigate an entire antitrust case (while following the full evidentiary standards of a trial). Complaining, for example, that an expert report from a similar matter involving the same subject matter was "inadmissible under Federal Rules of Evidence 702 and 703" because the report was not properly "supported by reliable methodologies and sufficient facts and data," the NCAA appears to believe that a preliminary injunction hearing is in fact a one-day trial on the merits rather than a preliminary hearing.

This Court, however, is under no such illusions. It has explained that the evidentiary standards for preliminary injunctions are not so rigorous as to require what in practical terms would take years[10] to develop. "Given [the] limited purpose

---

[9] From the infamous "Rule of Restitution," which the lower court noted sought to chill the court's ability to adjudicate these matters (JA1158-1161) to the standards espoused by the NCAA here, it is clear that part of the NCAA's goal is to make court access for student-athletes as difficult and costly as possible. This Court should not unwittingly join in that effort by deviating from its existing standards for preliminary injunctions.

[10] Even when settled by the parties, antitrust actions often taken years to develop. The *median* time from complaint filing to approval of settlement terms alone for

[of a preliminary injunction], and given the haste that is often necessary…a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981); *A.A.R.P. v. Trump,* 605 U.S. 91, 96 (2025); In *G.G. v. Gloucester Cnty. Sch. Bd.,* this Court explained that "[b]ecause preliminary injunction proceedings are informal ones designed to prevent irreparable harm before a later trial governed by the full rigor of usual evidentiary standards, district courts may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted." 822 F.3d at 725-26 (remanded on other grounds). Indeed, if the District Court *had* evaluated the Player's evidence "against a stricter evidentiary standard than is warranted by the nature and purpose of preliminary injunction proceedings to prevent irreparable harm before a full trial on the merits," the standard the NCAA implicitly espouses here, *that itself* would have been an abuse of discretion. *Id.*

In light of the actual standards in this Circuit, it is clear that the District Court's preliminary injunction should not be overturned or dissolved based upon its factual findings.

---

antitrust class actions exceeded 6.1 years in 2021. Laura Alexander, Joshua P. Davis, Diana L. Moss, Randy Stutz, American Antitrust Institute, Enforcement in a Time of Change, https://www.antitrustinstitute.org/wp-content/uploads/2022/05/HuntingtonCommentary2022-FINAL-for-Posting.pdf

**B. The District Court's Preliminary Injunction Was Proper.**

*a. The Five-Year Rule is Subject to Antitrust Scrutiny.*

The NCAA first argues that "Circuit Court Precedent"[11] makes it clear that the NCAA's eligibility rules are non-commercial and, thus, outside antitrust scrutiny.[12] But the NCAA never addresses that the District Court properly distinguished those cases, which can be readily differentiated both generally and specifically. The NCAA never addresses how the *House* settlement shifts the antitrust analysis for courts. As noted above, the *House* settlement was finally approved on June 6, 2025, and now allows universities to directly share up to 22% of the average revenue from the 5 largest sports conferences with student-athletes

---

[11] Setting aside questions of precedential value, the District Court explained why many of the cases cited by the NCAA were easily differentiated from the circumstances at hand: those cases were decided prior to *NCAA v. Alston*, 594 U.S. 69, 96 (2021) and prior to the *House* settlement and, thus, did not involve student-athletes receiving compensation for their Name, Image, and Likeness nor student-athletes involved in revenue-sharing at collegiate institutions. As such, their analysis under the modern college sports regime is limited. Even taking that into account, they can hardly be seen as applicable: "*Bassett* concerned a coach's challenge to enforcement of an NCAA rule prohibiting improper recruiting inducements and academic fraud…Bowers involved a student-athlete with a learning disability who was declared ineligible to compete in intercollegiate athletics during his freshman year." JA1116.

[12] The NCAA makes no attempt to reconcile its arguments that the District Court below should have adopted the findings from other circuit courts regarding whether its rules are commercial while it was clear error for the circuit court to acknowledge that other courts had also found that there is indeed a labor market for student-athletes.

like the Plaintiffs here (an estimated $20.5 million a year per school).  *House*, 2025 U.S. Dist. LEXIS at *37.  The *House* settlement now ties revenue directly to student-athlete participation, meaning that eligibility rules may be subject to antitrust scrutiny.

Not only that, but the NCAA has repeatedly admitted in this very litigation that regardless of whether the eligibility rules are "commercial in nature," the rule in question is specifically used to exclude laborers from the market to protect the NCAA's "unique product": "the Five-Year Rule ensures that veteran players are phased out to make way for newer incoming players on a schedule that is roughly in line with normal undergraduate study—which in turn preserves the NCAA's unique product." Appellant Br. 43; JA1194.  No other $17.5-billion-dollar-per-year industry[13], group, or cartel could speak like this in open court and expect to be found exempt from antitrust scrutiny. No other business could brag about its monopsony, about how it purposefully excludes laborers from the market in order to preserve its unique product, and expect to escape antitrust scrutiny.

*Bassett v. NCAA* a 6th Circuit decision upon which so much of the NCAA's argument rests, notes that "in order to state a claim under the Sherman Act there

---

[13] NCAA, Division I Athletics Finances 10-Year Trends from 2013 to 2022, December 2023, https://ncaaorg.s3.amazonaws.com/research/Finances/2023RES_DI-RevExpReport_FINAL.pdf

must be a commercial activity implicated." 528 F.3d 426, 433 (6th Cir. 2008). The NCAA cannot explain how NIL and revenue sharing are not implicated commercial activity.[14]

These are the reasons that courts, especially in light of *Alston* and the *House* cases, have increasingly found NCAA rules subject to antitrust scrutiny. The District Court below noted that many of the decisions upon which the NCAA relies "were grounded in a pre-NIL world" and that in this new "NIL era" it is "difficult to say" where the "lines between clearly commercial and those eligibility rules once thought to be explicitly non-commercial" lie. JA1117 (quoting *Sanchez v. NCAA,* 2025 U.S. Dist. LEXIS 37500, 2025 WL 684271, *10 (E.D. Tenn. Mar. 3, 2025)). The District Court below ultimately held that "[i]n the current era of NIL compensation, eligibility rules are commercial in nature. They dictate the number of years a student-athlete can market and profit from an NCAA Division I career." JA1119. That is seemingly confirmed both by the realities of NIL, but also rather conclusively by the revenue-sharing aspects of the *House* settlement.

---

[14] While the question of whether playing sports constitutes commercial activity has been resoundingly answered "yes," that was not always the case: "today the term 'commerce' is much broader than it was when either *E.C. Knight* [156 U.S. 1 (1895)] or *Federal Baseball Club* [259 U.S. 200 (1922)] was decided, including almost every activity from which the actor anticipates economic gain, and certainly including manufacturing and other productive activities in addition to buying and selling as well as the 'personal effort' of the paid professional athlete." Antitrust Law: An Analysis of Antitrust Principles and Their Application (CCH) 260b.

For those reasons, the District Court did not abuse its discretion when it held that there was a high likelihood that the Players could show that the eligibility rules in question were subject to antitrust scrutiny.

### b. *The District Court Properly Defined the Market.*

Despite ample evidence to the contrary, the NCAA simply refuses to believe that there is a "nationwide market for the labor of NCAA Division I college football players," as acknowledged by the District Court below JA1124. A market definition, for antitrust analysis purposes, is a question of fact. *Alston,* 594 U.S. at 81; *Eastman Kodak Co. v. Image Technical Servs.*, 504 U.S. 451, 463 (1992) (a "trier of fact" should resolve the question of a unified market); *IGT v. Alliance Gaming Corp.*, 702 F.3d 1338, 1344 (Fed. Cir. 2012) ("Definition of the relevant market is a question of fact."). The District Court's finding of a market is plausible because it came after reviewing the Players' briefing which cited and included as support (a) a chapter from an antitrust textbook describing the market for student-athlete labor and the NCAA's monopsony position in it (JA513 – 529); (b) an expert report filed in a separate case in the District Court of New Jersey (*Elad v. NCAA,* Civil Action No. 3:25-cv-1981, 2025 U.S. Dist. LEXIS 78922, 2025 WL 1202014 (E.D.N.J.)) describing the market for student-athlete labor in football in particular and how the rules in question in this matter affected that market (JA530-558); (c) a brief explanation of the market for student-athletes provided by Federal Reserve Bank of

St. Louis (JA573-574); (d) multiple court cases in which other courts acknowledged the existence of the same or similar market for student-athlete labor such as *NCAA v. Alston,* 594 U.S. at 90; *Pavia,* 760 F.Supp.3d at 539; *Braham v. NCAA,* Civil No. 3:25-cv-253, 2025 U.S. Dist. LEXIS 137047, 2025 WL 2017162, *13 (E.D. Nev. July 18, 2025); *Board of Regents*, 468 U.S. at 95-96.

In opposition the NCAA (and the 6th Circuit) caution that *Alston* did not specifically decide the question of market definition. While this is true, it can hardly be said that the market which served as the basis for the *Alston* decision has disappeared in the age of NIL and revenue-sharing. Indeed, if anything, the idea and definition of this market has gathered strength in the years since as commentators, players, coaches, and now even the NCAA widely acknowledge that student-athletes are to be paid not just for their name, image, and likeness, but also to directly share in the revenue their labor creates. The class (and thus the NCAA-agreed-upon settlement) in the *House* case is predicated upon the existence of such a market:

> Here, Plaintiffs have shown that named Plaintiffs House, Prince, Oliver, Carter, Harrison, and Solomon are adequate representatives for each of the proposed settlement classes they seek to represent, because their interests are aligned with members of those classes in securing a more competitive market for the labor of Division I student-athletes and in achieving greater compensation for Division I student-athletes via this litigation.

*House*, 2025 U.S. Dist. LEXIS 113799 at *55, 109, 113.

The District Court, then, was justified in finding and defining such a market and holding that the Players were likely to be successful in defining it. At minimum, the existence and definition of this frequently discussed and analyzed market is plausible and, thus, in that regard, the District Court's preliminary injunction order should not be overturned or dissolved.

### c. The 5-Year Rule is By Its Very Nature Anticompetitive.

By its own terms the 5-Year Rule limits who may compete in the college sports market. Perhaps this is why—despite its nominal arguments to the opposite—the NCAA openly admits that the very purpose of the rule is to exclude student-athletes from the college sports labor market: "…any eligibility rule will, by definition, reduce the pool of participating players…" Appellant Brief at 39. This particular rule "ensures that veteran players are phased out to make way for newer incoming players." *Id.* at 43. Similarly, the suggestion by the NCAA that "[t]here is no record evidence…showing that the Five-Year Rule lessens the total benefits that student-athletes receive from schools…" (Appellant Brief at 32-33) is incongruent with the record, which is replete with such evidence.

Chapter Nine of the textbook "Monopsony in Action," included as an exhibit to the motion for preliminary injunction in the District Court below (JA513-529), may not address the Five-Year Rule specifically, but does describe how the "NCAA's members collude on two key inputs in the production of athletic competition: the student-athletes themselves and their coaches." JA514. The text even diagrams and explains how colleges' profits are maximized by "restrict[ing] employment" and "imposing hiring quotas." (JA514-515):



Figure 9.1. Monopsony Labor Market.

Figure 9.1 shows the market for labor (athletes or coaches) services L, which is an input in producing athletic contests. The independent decisions of buyers and sellers of labor will lead to a wage of $w_1$ and a quantity of $L_1$. Although the schools enjoy some profits at competitive wages, they can do better. If they agree among themselves and use their collective buying power to depress price, they can increase

their profits at the expense of the athletes and coaches, and to the detriment of society. If the formerly independent schools pool their demands and coordinate their purchases, they can exploit whatever monopsony power they possess. In order to maximize their collective profits, they will restrict employment to $L_2$ and thereby depress the wage to $w_2$, which is below the competitive wage.

JA515 (emphasis added).

Similarly, the expert report of Dr. Joel Maxcy (JA530-558) specifically addresses the exact same economic issues in this matter and notes "[t]he Five-Year Rule as applied to JUCOs has substantial anticompetitive effects on the labor market for college football athletes in general and NCAA Division I football players in particular." JA557. "Because the Five-Year Rule penalizes student-athletes who attend JUCOs, however, JUCOs are harmed in their ability to compete with NCAA schools in the labor market for student-athletes." JA543. Dr. Maxcy's report even noted that "…because the challenged eligibility restriction is targeted directly at certain athletes who participated at the JUCO level and not those who delayed their NCAA participation in other ways—by competing at prep schools, for example, or by joining the Armed Services—the Five-Year Rule as applied to JUCOs comes very close to a 'group boycott', a per se antitrust violation of the Sherman Act." JA543.

In addition to those exhibits considered by the District Court below, both Players and the District Court cited multiple court decisions which acknowledged both that general eligibility rules and the 5-Year Rule specifically were by their very nature anticompetitive:

> The eligibility regulations imposed by the NCAA and its member organizations generally constitute horizontal agreements. *See Business Elec. Corp. v. Sharp. Elec. Corp.*, 485 U.S. 717, 730 (1988) (explaining that horizontal agreements are agreements between competitors at the same level in a particular industry). There is no question that the NCAA and its members hold monopsony power over the labor market for college football and, therefore, have "market power." *See Alston*, 594 U.S. at 109 (Kavanaugh, J., concurring) ("[The] NCAA acknowledges that it controls the market for college athletics" and "accepts that its members collectively enjoy monopsony power in the market for [college athlete services[.]").

JA1125.

The NCAA further argues that in finding the JuCo Penalty anticompetitive the District Court engaged in "flawed reasoning" with "no limited principle." In support of this argument, it cites an *amicus curiae* brief not filed at any level in this matter, but rather in the *Pavia* appeal.[15] But, of course, there is a very simple limiting

---

[15] The NCAA strangely condemns the District Court below for "accord[ing] deference" to an amicus brief from the West Virginia Attorney General while at the same time "disregard[ing] the Department of Justice's Statement of Interest, the President's Executive Order, and the Brief Amicus Curiae of American

principle in the District Court's finding: the *Pavia* waiver and the District Court's preliminary injunction in this case do *not* affect limits on the years student-athletes may spend competing at an NCAA institution, only that the student-athletes cannot be arbitrarily penalized (and the student-athlete labor market arbitrarily limited) based upon a student-athlete previously attending a JuCo.

The District Court, then, was justified in finding that the 5-Year Rule was anticompetitive and that the Players were likely to be successful in showing as much. At minimum, the anticompetitive effect of this rule was amply discussed in the evidence and case law before the District Court and its holding is plausible and, thus, in that regard, should not be overturned or dissolved.

### d. There Are No Procompetitive Justifications for the 5-Year Rule.

As mentioned above, the NCAA's "Pavia Waiver," a so-called "blanket waiver," gives the game away; it is a tacit admission that there is no rational or procompetitive basis for the NCAA's JuCo penalty. The *Pavia* Waiver states that a season playing JuCo does *not* count towards an NCAA student-athlete's four seasons of athletic competition but *does* count towards the 5-Year Rule in which a student-athlete may compete. The NCAA makes no attempt to explain why allowing a

---

Counsel on Education." The difference between the documents, of course, is that the West Virginia Attorney General *filed an amicus brief* in the District Court below while the other documents were either general in nature or actually part of different cases and merely cited for support in the NCAA's brief.

player one or more seasons of *actually playing sports* in JuCo can be literally waived away with little to no effect on collegiate sports competition but that competition will be harmed by student-athletes *attending school*. Indeed the argument that student-athletes should be penalized for more years of preparatory schooling is almost perverse for an organization that publicly portrays itself as upholding the importance and integrity of higher education.

The NCAA argues that the sheer length of time the Players attended school affects competition, that the District Court's decision untethers college sports from the educational experience. Setting aside the obvious point that by its very terms the order is related only to students that have been receiving an "education experience" in a non-NCAA institution, the NCAA does not (and indeed cannot) explain why competition is not harmed by its already-existed bylaws "untethering" sports from the "educational experience," such as those waiving the 5-Year Rule for years spent on religions missions, while in the Military Sea Transport Service, serving in the Peace Corps, or working at an internship. JA135-136. While those are all obviously worthwhile endeavors, they can hardly be said to be more related to the "educational experience" than *actually attending school.*

Finally, it should be noted that, despite acknowledging that on its face the 5-Year Rule is anticompetitive, the NCAA offers no actual evidence showing that it

serves a procompetitive purpose or has procompetitive effects. Instead the NCAA points to findings from other cases.[16]

There is, quite simply, no rational pro-competitive purpose to say that seasons spent playing a sport in Junior College do not count towards a limit of 4 seasons playing that sport, but semesters spent studying in Junior College do count towards eligibility. Far from aiding competition in the student-athlete labor market, the rule restricts the student-athlete labor market while perversely punishing students who may not be ready for the rigors of the academic load of an NCAA institution, but who wish to further their education nonetheless.

The District Court's holding that there was no substantial pro-competitive rational for the 5-Year Rule as it applied to JuCo transfers, therefore, is not an abuse of discretion, but rather an acknowledgement of reality.

> e. *The Players Would Be Irreparably Harmed Without This Preliminary Injunction.*

When it is not litigating against student-athletes, the NCAA normally acknowledges that playing college sports is a once-in-a-lifetime opportunity. The NCAA readily agrees that:

---

[16] The NCAA makes no attempt to square its argument that the District Court erred by citing to other courts that had also found a labor market for student-athletes while simultaneously arguing that the district erred by not adopting findings from *Arbolida v. NCAA,* Case No. 25-2079, 2025 U.S. Dist. LEXIS 31283, 2025 WL 579830 (D. Kan. Feb. 21, 2025).

- "The advantages of competing in college sports are both immediate and lifelong. Participating in college sports provides opportunities to learn, compete and succeed."[17]

- "Student-athletes as a group graduate at higher rates than their peers in the general student body and feel better prepared for life after college."[18]

- "Student-athletes have the opportunity to travel across the country and around the world for competition, including regular-season, NCAA championships and foreign tours. Some student-athletes receive national and international exposure during competition. These experiences can open doors for the few who will compete professionally and for the majority who will go pro in something other than sports."[19]

- "Preparation for Life…By competing in college sports, student-athletes learn important skills, like leadership, time management and how to effectively work with others toward a common goal. Companies have specifically said that they seek to hire former student-athletes, and the majority of student-athletes say that participating in college sports prepares them for life after graduation."[20]

But now the NCAA argues that needlessly excluding the Players from these unique and lifelong benefits does not constitute irreparable harm.   But the Players here are

---

[17] Want to Play College Sports?, https://www.ncaa.org/sports/2021/2/8/student-athletes-future.aspx

[18] Want to Play College Sports?, https://www.ncaa.org/sports/2021/2/8/student-athletes-future.aspx

[19] Benefits to College Student-Athletes, https://www.ncaa.org/sports/2014/1/3/benefits-to-college-student-athletes.aspx

[20] Benefits to College Student-Athletes, https://www.ncaa.org/sports/2014/1/3/benefits-to-college-student-athletes.aspx

not only being excluded from collegiate athletics but are also harmed by the fact that—like many others—in the chaos sown by the NCAA's "blanket waiver" announcement, the Players withdrew from the NFL draft, making them ineligible for professional play this year.  JA51, JA56, JA61, JA66.

Perhaps because of this the NCAA chooses to focus on the supposed delays by the Players in bringing their case.  Such an argument is flawed in a number of regards. The NCAA's criticism that the Players "kn[ew] of the expiration of their eligibility since the conclusion of the 2024 football season" (Appellant Brief at 44) ignores not one, but two intervening and fundamental shifts in college sports: the NCAA's *Pavia* Waiver in December 2024 and the *House* settlement in June 2025. The NCAA did not even clarify its *Pavia* Waiver until March 2025.  JA1205-1206. Not only that, but two of the Players were still attempting to utilize the NCAA's internal administrative processes up until June and another did not receive a decision from the NCAA until August 8, 2025.  JA1196.  The NCAA answers by saying that "nothing precluded Appellees from seeking remedy from the courts simultaneously to the [internal] waiver process."  This is yet again another "heads the NCAA wins, tails the student-athlete loses" proposition: the Players were well aware that, had they done exactly what the NCAA now proposes, the NCAA would have instead argued their lawsuit was not yet ripe for judicial resolution.  How did the Players know this? Because this is precisely what the NCAA previously argued in the

Northern District of West Virginia when a different student-athlete sought protection from the court.[21] So while it argues here that Players did not need to wait for the waiver process, when the NCAA believed it was to its benefit, it argued the opposite: **"Plaintiff Does Not Have Standing Because His Claims Are Not Ripe While the NCAA Reconsiders His Waiver Request."** Def. Mem. Law, p. 3, Dkt. No. 6, *Battle v. NCAA*, Civil Action No. 1:23-cv-101 (N.D.W. Va. Dec. 13, 2023) (accessible via PACER)(emphasis in original). The Players here should not be penalized or held to have "manufacture[d] irreparable harm" because they first tried to comport with the NCAA's internal procedures.

Finally, while it is true some courts have held that preventing someone from playing college sports does not constitute irreparable harm, many others have held just the opposite. *S.A. v. Sioux Falls Sch. Dist. 49-5,* No. 4:23-CV-04139, 2023 U.S. Dist. LEXIS 185464, 2023 WL 6794207, *9 (D.S.D. Oct. 13, 2023) (citing *Portz v. St. Cloud State Univ.*, 401 F.Supp.3d 834, 868 (D. Min. 2019)); *see also McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 302 n.25 (2d Cir. 2004); *Navarro v. Fla. Inst. of Tech., Inc.*, No. 6:22-cv-1950, 2023 U.S. Dist. LEXIS 27519, 2023 WL 2078264, *16-17 (M.D. Fla. Feb. 17, 2023) (courts have

---

[21] The Plaintiff in that case filed multiple appeals in the NCAA internal waiver process and was well into the sports season before filing for his injunction, blunting the NCAA's argument for that plaintiff in a way that did not apply to the student-athletes here. Def. Mem. Law, p. 1, Dkt. No. 6, *Battle v. NCAA,* Civil Action No. 1:23-cv-101 (N.D.W. Va. Dec. 13, 2023) (accessible via PACER).

consistently held that losing the opportunity to participate sports is irreparable harm); *Biediger v. Quinnipiac Univ.*, 616 F. Supp. 2d 277, 291 (D. Conn. 2009) ("Courts have consistently held that, given the fleeting nature of college athletics, plaintiffs will suffer irreparable harm by losing the opportunity to participate in their sport of choice on a continuous and uninterrupted basis."); *Brooks v. State Coll. Area Sch. Dist.*, 643 F. Supp. 3d 499, 510 (M.D. Pa. Dec. 1, 2022); *Mayerova v. E. Mich. Univ.*, 346 F. Supp. 3d 983, 997 (E.D. Mich. 2018); *but see Sharon City Sch. Dist. v. PIAA,* Civil Action No. 9-213, 2009 U.S. Dist. LEXIS 13037, 2009 WL 427373, at *4 (W.D. Pa. Feb. 20, 2009); *Dziewa v. Pennsylvania Interscholastic Athletic Ass'n*, Civil Action No. 08-5792, 2009 U.S. Dist. LEXIS 3062, 2009 WL 113419, at *17-18 (E.D. Pa. Jan. 16, 2009); *Doe v. Portland Pub. Sch.,* 701 F.Supp.3d 18, 39 (D. Me. 2023); *Revesz v. Pa. Interscholastic Ath. Ass'n, Inc.,* 798 A.2d 830, 837 (Commonwealth Court of Pa. May 21, 2002).

The District Court below, then, did not err when it considered all of these factors and held that these Players would be irreparably harmed. According to Defendant's repeated public admissions, the Players faced the loss immediate and lifelong advantages, decreasing their odds of graduating college, preventing them from experiencing life-changing travel, preventing them from receiving national and international exposure which may open doors to playing professional sports, or

otherwise limiting their job prospects out of college, and overall leaving them less

prepared for life.[22]  It is hard to imagine a list of more irreparable harms.

### f.  The Balance of Equities Favors the Players.

The balance of equities in this matter tips strongly in the Players favor, who

merely ask that they be given the same opportunities that other players have already

been given.  This is especially true given that the NCAA cannot provide any

---

[22] As NCAA President Mark Emmert testified before the U.S. Senate Committee on Commerce, Science & Transportation:

> …research conducted by Nobel Prize winning labor economist Professor James Heckman of the University of Chicago, which he based on the National Education Longitudinal Survey (NELS), shows that participants in athletics are more likely to go to college, to stay and graduate from college, to secure a good job after college, and earn more money within a few years after college and for a lifetime. These results hold for football and men's basketball players, within Division I and across all divisions, and are accurate across many peer comparisons, including those from diverse racial and ethnic backgrounds as well as disadvantaged or difficult family circumstances, controlling for standardized testing variables and non-cognitive traits. College is a powerful force for social advancement and building human capital, and research shows that athletics has a positive relationship with that force. Participation in intercollegiate sports has been a significant means to realizing the benefits of college for hundreds of thousands of young people for decades…

NCAA president's testimony on value of college model, July 9, 2014, https://www.ncaa.org/news/2014/7/9/ncaa-president-s-testimony-on-value-of-college-model.aspx

procompetitive basis for its JuCo Penalty.  At best these rules are arbitrary and the NCAA has neither the right to decide someone's economic life arbitrarily and capriciously nor to arbitrarily and capriciously restrain trade, commerce, and competition.  The NCAA publicly professes that its highest concern is for student-athlete welfare, but it penalizes student-athletes who may be better off temporarily attending non-NCAA academic institutions.

The NCAA argues that prospective and speculative harm to unknown "incoming student-athlete[s]" should defeat the preliminary injunction here.  But that argument requires speculation upon speculation upon speculation: the court must conjure a theoretical college athlete, that theoretical college athlete must play the same position as Players, must choose to attend the same school as the Players, and must then try out and earn a spot on the team.  That logic also ignores a vital point: the District Court's preliminary injunction below does not give roster spots to Players, it merely makes them eligible.  JA1203-1204.  Other student-athletes could have very well-earned roster spots over the Players.

Though it cites court decisions from similar cases, the NCAA provides no actual evidence of harm to any person real or speculative.  There is no equitable position that says these Players must suffer particularly so that the NCAA as a whole may benefit in some vague, amorphous, and immeasurable way.  There is no harm or detriment to anyone in granting the Players here the same eligibility that other

players have already been given.  The NCAA grants waivers like this on a regular basis with no apparent ill-effect to college sports or student-athletes.  Even the 7th Circuit in *Fourqurean v. NCAA* "…note[d] that the NCAA's bylaws allow the NCAA's Committee for Legislative Relief to grant 'relief from application of NCAA legislation to a particular situation in which no other entity has the authority to act,' which appears to create some flexibility for the NCAA to address the hardship to Fourqurean that concerned the district court." 143 F.4th at 871.

The balance of equities, therefore, sides with the Players and the District Court did not err in holding as such.

> g.    *The Public Interest Favors the Players.*

The NCAA's brief does address the public interest and, as such, has waived any argument regarding it.

## III.   Conclusion

The District Court's preliminary injunction was not an abuse of discretion. Instead it was a careful and thoughtful analysis and application of the law and a thorough review of the available evidence. For that reason this Court should not overturn or dissolve it.

SUBMITTED BY:

/s/ John F. Gianola_____
John F. Gianola
Lewis Gianola PLLC
300 Summers Street
Suite 700
Charleston, WV 25301
(304) 345-2000
john.gianola@lewisgianola.com

*Counsel for Plaintiff-Appellees, Jimmori Robinson, Jeffrey Weimer, Tye Edwards, and Justin Harrington*

# STATEMENT REGARDING ORAL ARGUMENT

Though often dismissed as nothing more than petty squabbles over college sports, the issues presented in this matter touch upon many important and fundamental legal topics: the freedom to contract and share in the revenue one helps generate, the standards for preliminary injunctions and access to the courts, whether organizations can escape court review of their economic activities by clinging to a label of not-for-profit amateurism. Moreover, given their publicity, these cases call for the Court's highest levels of scrutiny, both to ensure the correct outcome, but also to reassure a public that may often be unfamiliar with our court system what an open, honest, and probing legal system looks like.

Finally, in many ways, the livelihood of Players and the thousands in their situation, depends upon the outcome of this and similarly-situated cases. Before this or any court decides upon what for many student-athletes is the surest way out of poverty and, unfortunately—perhaps—the only real chance they will ever have to earn money based upon their years of hard work and natural gifts, it should engage in the scrutiny that only oral argument can provide.

**Signed**: _/s/ John Gianola_____
John F. Gianola

*Counsel for Plaintiff-Appellees*

## CERTIFICATE OF COMPLIANCE

This Brief complies with the type-volume limit of Fed. R. App. P. 29(b)(4) because this document contains 9088 words.

This Motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft® Word for Microsoft 365 MSO (Version 2507 Build 16.0.19029.20136) 64-bit in 14-point Times New Roman font.

Dated: November 24, 2025

**Signed**:＿/s/ John Gianola＿＿＿＿＿
John F. Gianola

*Counsel for Plaintiff-Appellees*

# CERTIFICATE OF SERVICE

I hereby certify that on November 24, 2025, I caused the foregoing to be filed electronically with the Clerk of Court for the United States Court of Appeals for the Fourth Circuit. The Motion will be served on all registered counsel through the Court's CM/ECF system.

**Signed**:___/s/ John Gianola_____
John F. Gianola

*Counsel for Plaintiff-Appellees*