CASE NO. 25-2003

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION

*Appellant.*

v.

JIMMORI ROBINSON; JEFFREY WEIMER; TYE EDWARDS; JUSTIN
HARRINGTON

*Appellees,*

ON APPEAL FROM UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA
1:25-CV-00075-JPB

**REPLY BRIEF OF APPELLANT**

HOLLAND & KNIGHT LLP

Thomas Woodrow
Nishma Patel
1120 S. Tryon Street, Suite 900

Charlotte, North Carolina 28203
980-215-7797
tom.woodrow@hklaw.com
nishma.patel@hklaw.com

J. Douglas Minor, Jr.
1180 West Peachtree Street, Suite 1800
Atlanta, Georgia 30309
(404) 817-8500
doug.minor@hklaw.com

*Attorneys for Appellant-Defendant, National Collegiate Athletic Association*

# CORPORATE DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 25-2003    Caption: National Collegiate Athletic Associate v. Robinson, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

National Collegiate Athletic Associate
(name of party/amicus)

who is Appellant, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? NO

2. Does party/amicus have any parent corporations? NO
   NO If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? NO
   If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? NO
   NO If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) <u>NO</u>

6. Does this case arise out of a bankruptcy proceeding? <u>NO</u>
   NO If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? <u>NO</u>
   If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.


Signature: <u>  /s/ Nishma Patel      </u>          Date: <u> December 15, 2025</u>

Counsel for: <u>  Appellant</u>

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................1

ARGUMENT ......................................................................................4

I.    Appellees Misrepresent the Standard of Review on Appeal. ......................4

II.    The District Court Erred In Addressing The Relevant Antitrust Market. ...........................................................................5

    a.    The Secondary Authorities and Caselaw in Appellees' Response Are Not Evidence of a Relevant Antitrust Market. .........................................7

    b.    The Third Circuit's Recent Opinion in *Elad v. NCAA* Rejected the Expert Report Relied Upon by Appellees Below. ....................................8

    c.    The State of West Virginia's Amicus Brief Restates Appellees' Relevant Market Arguments. ...............................................10

III.    Appellees Have Failed to Respond to the Evidence Disproving the District Court's Finding of Anticompetitive Effects. ................................12

IV.    Appellees Ignore the NCAA's Procompetitive Justifications. ..................16

V.    Appellees Provide No Explanation For Their Failure to Timely File Suit. ........................................................................18

CONCLUSION .................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Banks v. NCAA,*
    977 F.2d 1081 (7th Circ. 1992) ........................................................................14

*Braham v. NCAA,*
    794 F.Supp.3d 824 (D. Nev. 2025)................................................................8, 11

*Elad v. NCAA,*
    2025 WL 3278106 (3rd Cir. Nov. 25, 2025) ..............................................*passim*

*Fourqurean v. NCAA,*
    143 F.4th 859 (7th Cir. 2025) .......................................................................7, 12

*House v. NCAA,*
    No. 4:20-cv-03919, 2025 WL 1675820 (N.D. Cal. June 6, 2025) ............*passim*

*Loren Data Corp. v. GXS, Inc.,*
    501 F. App'x 275 (4th Cir. 2012) ....................................................................15

*Morris v. Wachovia,*
    448 F.3d 268 (4th Cir. 2006) .............................................................................4

*Mt. Valley Pipeline, LLC v. 6.56 Acres,*
    915 F.3d 197 (4th Cir. 2019) .............................................................................5

*NCAA v. Alston,*
    594 U.S. 69 (2021)..............................................................................................6

*Ohio v. Am. Express,*
    585 U.S. 529 (2018)...................................................................................*passim*

*Ohio v. NCAA,*
    706 F.Supp.3d 583 ............................................................................................8

*Pavia v. NCAA,*
    154 F.4th 407 (6th Cir. 2025) ...................................................................*passim*

*Pavia v. NCAA,*
    760 F.Supp.3d 527 (M.D. Tenn. 2024)...............................................................8

*Tennessee v. NCAA,*
   718 F.Supp.3d 756 (E.D.Tenn. 2024).................................................................8

# INTRODUCTION

The District Court's grant of a preliminary injunction is improper as a matter of law and poses a direct threat to the orderly administration of collegiate athletics. Every federal appellate court that has addressed the validity of the NCAA's eligibility rules has upheld them, including two within this calendar year. But the District Court nevertheless found that the NCAA's longstanding Five-Year Rule is an unlawful restraint on competition. As set forth in the NCAA's initial brief, the District Court's issuance of a status-quo-altering mandatory injunction—without any evidence on critical elements of an antitrust claim, or evidence that would excuse Appellees' delay in bringing suit—is error.

Appellees' brief, and the amicus brief filed by the Attorney General of West Virginia, fail to defend the injunction issued below based on the record developed below. Appellees and their amicus attempt to support the District Court's adoption of their proposed relevant market through a variety of sources devoid of any hard economic evidence. As multiple appeals courts have recognized, it is improper to rely on judicial observations about market definition made in cases where the issue was not litigated and where market conditions were markedly different from today. Similarly, Plaintiffs cannot satisfy their burden by relying on secondary materials that do not purport to define a relevant market and on an expert report submitted in support of an injunction in a different case, particularly when that injunction was

vacated by the U.S. Court of Appeals for the Third Circuit the day after Appellees' response brief was filed. In short, none of what Appellees and their *amici* have brought forward substitutes for the actual economic evidence necessary to satisfy Appellees' burden of defining the relevant market.

Appellees further fail to show that the Five-Year Rule harms competition. The antitrust laws protect competition, not individual competitors. To show harm to competition, Appellees needed to produce some evidence of *market-wide* effects on output or price. Plaintiffs cannot do that in light of the *House* settlement, which established roster limits and a cap on institutional payments to student-athletes. As a result of those developments, Plaintiffs cannot show that the Five-Year Rule restricts output (roster sizes will be the same regardless of which student-athletes get to compete) or prices (there is a maximum on how much schools can spend on players regardless of their level of experience).

Additionally, Appellees have done nothing to rebut the NCAA's procompetitive justifications, all of which it maintains. The Five-Year Rule does expand athletic output; while the number of roster spots is now fixed at each school, the Rule ensures that new student-athletes enter college sports every year and can enjoy the corresponding lifelong benefits. In bringing new high school students into college sports every year, the Five-Year Rule preserves college athletics as a unique offering as opposed to a perpetual training ground for older student-athletes. And

the Rule aligns athletics and academics by having the time for athletic competition generally correspond to the time it takes to obtain an undergraduate degree. These are all valid procompetitive purposes maintained by the institutions of higher education that pass the rules, as confirmed by a recent declaration issued in by the Commissioners of the Defendant Conferences in *House*.

Finally, Appellees seek to defend their delay in pursuing injunctive relief through reliance on the "Pavia waiver." But that waiver, by its terms, did not apply to them. It was also issued seven months before they filed suit, and Appellees provide no explanation for why they waited so long to sue.

In short, the only proffered evidence of a relevant antitrust market in the record has been explicitly rejected as insufficient under federal antitrust law. Plaintiffs have failed to develop any record evidence as to competitive effects. And Appellees have wholly failed to excuse their delay in seeking injunctive relief. For these reasons, and for the reasons set forth in the NCAA's opening brief, the injunction below should be vacated.[1]

---

[1] Appellees suggest that the NCAA has "waived" the "issue" of the Rule of Restitution and "does not wish for it to be further litigated." (Response Br. at 1.) Appellees are mistaken. The NCAA did not oppose Appellees' request to enjoin the Rule of Restitution in the event the District Court entered judgment in Appellees' favor. (JA1158.)

## ARGUMENT

## I.  Appellees Misrepresent the Standard of Review on Appeal.

The parties do not dispute that this Court reviews the issuance of a preliminary injunction for abuse of discretion, with legal conclusions reviewed *de novo* and factual findings reviewed for clear error. (Opening Br. at 22; Response Br. at 12.) The parties also do not dispute that an injunction premised upon erroneous legal principles or a clearly erroneous factual finding constitutes an abuse of discretion. *Id.*; *Morris v. Wachovia*, 448 F.3d 268, 277 (4th Cir. 2006). Despite the parties' agreement, Appellees contend that the NCAA "seeks to deviate from this standard of review." (Response Br. at 14.)

Appellees contend that the NCAA's appeal is premised on the contention that they were "required to litigate an entire antitrust case" in order to establish a likelihood of success on the merits. *Id.* This contention is a mischaracterization of the NCAA's opposition to the injunction below. The injunction below is not error because the District Court failed to conduct a full trial. It is error because the District Court did not hold Appellees to their burden of showing a likelihood of success on the merits. As just one example, the District Court accepted Appellees' assertion of a relevant market and did not require them to bring forth *any* analysis or data to support their proffered antitrust market. (JA1107-08.) In the context of "the applicable antitrust legal framework," the "plaintiff bears the burden to define the

relevant market." *Elad v. NCAA*, 2025 WL 3278106 at *2, *3 (3rd Cir. Nov. 25, 2025).

In reality, it is Appellees—not the NCAA—that seek to alter the governing standard of review. They contend that the injunction "should not be overturned" because "the District Court's account of the evidence is plausible." (Response Br. at 5, 13.) But the law requires Appellees to show a likelihood of success on the merits, not just clear the plausibility standard applicable at the motion to dismiss stage.[2] And in any event, the district court's findings are not even plausible, as further explained below.

## II.   <u>The District Court Erred In Addressing The Relevant Antitrust Market.</u>

"The rule of reason aims to 'distinguis[h] between restraints with anticompetitive effect that are harmful to the [market] and restraints stimulating competition that are in the [market's] best interest.' *Am. Express*, 585 U.S. at 541 (first alteration in original). Assessing the distinction requires a robust market

---

[2] Appellees' contention that the District Court's factual finding is "plausible" draws support from *Mt. Valley Pipeline, LLC v. 6.56 Acres*, 915 F.3d 197, 213 (4th Cir. 2019) ("So long as the district court's account of the evidence is plausible in light of the record viewed in its entirety, [an appellate court] may not reverse even if [the appellate court] is convinced that [it] would have weighted the evidence differently."). However, *Mt. Valley Pipeline* did not weaken the standard for this Court's review of preliminary injunctions. The court simply stated it would not impose its judgment on a district court's weighting of evidence. This language has no impact on the Court's review here because the record does not include any evidence of a relevant antitrust market.

analysis in which a court must 'conduct a fact-specific [examination] of "market power and market structure ... to [determine] the [restraint]'s actual effect' on competition." *Id.* (quoting *Copperweld v. Independence Tube*, 467 U.S. 752, 768 (1984)). Because courts must engage in a robust market analysis, a precisely defined relevant market is essential. *Id.* at 542-43; *see also NCAA v. Alston,* 594 U.S. 69, 93 (2021) ("[w]hether an antitrust violation exists necessarily depends on a careful analysis of market realities").

The Parties do not dispute that Appellees were required to define a relevant antitrust market in order to obtain injunctive relief. Appellees rely on four categories of evidence in support of their contention that the District Court's market definition was proper: 1) a chapter of a 2012 textbook; 2) three sentences from a 2023 publication of the Federal Reserve Bank of St. Louis; 3) citations to several authorities involving litigation against the NCAA; and 4) the expert report offered by the plaintiff in *Elad v. NCAA*. (Response Br. at 19-20.) None constitutes actual evidence of a relevant antitrust market.[3]

---

[3] Appellees also rely on the order granting the motion for final approval of the *House* settlement. (Response Br. at 20.) In doing so they advance an argument that they did not make below. Moreover, the passage they cite reflects the court's finding that the named plaintiffs "are adequate representatives for each of the proposed settlement classes they seek to represent ...." *Id*.; *In re: College Athlete NIL Litig.*, 2025 WL 1675820, *14 (N.D. Ca. June 6, 2025). The order does not include a finding of a relevant antitrust market in Division I football.

a. The Secondary Authorities and Caselaw in Appellees' Response Are Not Evidence of a Relevant Antitrust Market.

Neither the 2012 textbook chapter nor the Federal Reserve Bank article cited in Appellees' brief references or analyzes a nationwide market for Division I college football athletes. The textbook chapter includes a thirteen-year-old discussion of "the labor market for student-athletes and coaches" across forty collegiate sports, (JA513-21), and the Federal Reserve Bank publication includes a general discussion of a "monopsony labor market for amateur athletes" without any analysis of a nationwide market for Division I football athletes. (JA573.)

The District Court's reliance on *Alston* and decisions from other district courts as support for its adoption of Appellees' market definition is similarly misplaced. "The *Alston* court did not decide the question of market definition." *Fourqurean v. NCAA*, 143 F.4th 859, 870 (7th Cir. 2025). Similarly, the Third Circuit recently rejected the *Elad* district court's relevant market finding due to its reliance on "market realities predating the Supreme Court's decision in [Alston]." *Elad*, 2025 WL 3278106, at *5 (vacating the injunction "[b]ecause Elad's—and by consequence the District Court's—market definition does not account for changed market realities in *Alston*'s wake ....") The Third Circuit also rejected Elad's reliance on *Pavia* to support his asserted market definition because of *Pavia*'s reliance on *Alston*. "To the extent that Elad points to *Pavia* as also supporting his market definitions, it too relies almost exclusively on *Alston* or other case law to define the relevant market. We do

not read Supreme Court precedent as allowing this." *Elad*, 2025 WL 3278106, at

n.12 (citation omitted) *see also Pavia v. NCAA*, 154 F.4th 407, 416 (6th Cir. 2025)

(Thapar, J., concurring) (noting that Pavia failed to provide statistics or studies to

support the contention that players choose NCAA schools over JUCOs and failed

identify Division I labor-market effects resulting from the exclusion of JUCO

players).[4]

      b.    <u>The Third Circuit's Recent Opinion in *Elad v. NCAA* Rejected the Expert Report Relied Upon by Appellees Below</u>.

Appellees likewise fail in attempting to rely on the expert report submitted by

a different student-athlete in the *Elad* case. Even assuming it was appropriate for

Appellees to rely on an expert opinion offered in a different case, the Third Circuit

recently reversed the entry of a similar injunction based on that precise expert report.

Like the District Court below, the district court in *Elad* "failed to define the relevant

market altogether; it never made any factual findings regarding the market." *Elad*,

---

[4] Because the other authorities cited by the District Court rely on the parties' agreement to the relevant antitrust market in *Alston*, rather than evidence, they necessarily provide no support for the District Court's relevant market finding. *See Tennessee v. NCAA*, 718 F.Supp.3d 756, 762 (E.D.Tenn. 2024) ("The NCAA accepts that its members collectively enjoy monopsony power in the market for student-athlete services . . . .") (quoting *Alston*); *Ohio v. NCAA*, 706 F.Supp.3d 583, 592 ("*Alston* explained that the NCAA accepts that its members collectively enjoy monopsony power in the market for student-athlete services."); *Braham v. NCAA*, 794 F.Supp.3d 824, 834 (D. Nev. 2025) (relying on *Alston*, *Ohio*, and *Elad*); and *Pavia v. NCAA*, 760 F.Supp.3d 527, 539 (M.D. Tenn. 2024) (relying on *Alston*, *Tennessee*, and *Ohio*).

2025 WL 3278106, at *5. Because the district court "simply recited Elad's expert's .... identified market," the Third Circuit found that the court committed error by failing to "engage in a fact-specific analysis of the relevant market despite the parties' differing opinions on the topic." *Id*.

Moreover, the Third Circuit provided a detailed rejection of Dr. Maxcy's report, calling it "antithetical to antitrust legal principles":

> Even if we assume the district court intended to rest its relevant market finding on Dr. Maxcy's factual findings, the district court clearly erred. Dr. Maxcy exclusively relies on *Alston* to define the relevant market; he cites no market evidence or economic data. App. 121-24 (testifying that he did not conduct, or consult, any economic analyses to support his opinions). On its own terms, this reliance fails: Dr. Maxcy's opinion concerns all college-football players—including NCAA Division I and JUCO players—but *Alston* concerned only a specific subset of NCAA Division I football and basketball athletes. *Alston*, 594 U.S. at 80. More fundamentally, Dr. Maxcy predicated his market findings solely on static markets, unsupported by evidence, that predated the shifts in the college-football market after *Alston*. Reliance on a previously accepted market, without inspection of current market realities, is antithetical to antitrust legal principles. See *id.* at 93 (observing that college-sports markets have changed significantly and that when "market realities change, so may the legal analysis").

*Id*. at *6. [5]

---

[5] Dr. Maxcy's entire market analysis consists of just two paragraphs, in which he quotes the market asserted in the complaint and states, "I agree that this is the proper definition of the relevant market. This definition is consistent with the definition of the relevant market the Supreme Court accepted—and the NCAA did not challenge—in *Alston* [and] *Pavia*." (JA536 ¶ 14.)

In short, the District Court erroneously relied on *Alston*, which did not make a factual determination of any relevant antitrust market. And Appellees' defense of that definition cites only irrelevant authorities and other sources that echo the district court's record. None of these sources constitutes "a fact-specific [examination] of 'market power and market structure ....'" *Am. Express*, 585 U.S. at 541 (quoting *Copperweld,* 467 U.S. at 768). As in Elad, Appellees' reliance on Alston and Dr. Maxcy did not suffice to meet their burden and the District Court's determination otherwise was clear error.[6]

c.    The State of West Virginia's Amicus Brief Restates Appellees' Relevant Market Arguments.

The amicus brief submitted by the Attorney General's Office for the State of West Virginia ("WV AG") cannot save Appellees' antitrust claim. It is a restatement of Appellees' arguments in the District Court and on appeal and suffers from the same deficiencies. Appellees' antitrust claim fails due to the absence of evidence supporting the existence of a relevant antitrust market or evidence that the Five-Year

---

[6] Appellees acknowledge that *Alston* "did not specifically decide the question of market definition." (Response Br. at 20.) However, in the next two sentences they confusingly reference "the market which served as the basis for the *Alston* decision" and claim "the idea and *definition of this market* has gathered strength in the years since ...." *Id*. (emphasis added). Appellees' continued embrace of *Alston* reveals their awareness that they have not otherwise satisfied their burden of defining a relevant market.

Rule is anticompetitive. The WV AG's conclusory arguments are no substitute for that evidence.

The WV AG acknowledges that Appellees' claim must be evaluated under the rule of reason (Amicus Br. At 3, 6–7), and that, under the rule of reason, it is Appellees' burden to establish the existence of the relevant market. *Id.* at 6, 12. However, the WV AG's attempt to defend the District Court's relevant market determination is grounded in its view that the market "makes sense." *Id.* at 12. The WV AG does not cite to any authorities recognizing that a relevant antitrust market can be defined by such a vague and subjective standard.

Like Appellees' brief, the *amicus* brief does not include a fact-specific examination of market power and market structure, or the robust market analysis necessary to define a relevant market. *See Am. Express*, 585 U.S. at 541. Indeed, the WV AG fails to provide any data or analysis to support its contention that "the only positions [that] are reasonably interchangeable with NCAA Division I positions are other Division I spots." *Id.* at 12 (quoting *NHL Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 482 (6th Cir. 2005). It likewise fails to identify data or analysis showing that "Division I football is "the sole pathway to NFL opportunities" or that it provides benefits that are unavailable elsewhere." *Id.* at 12-13 (quoting *Braham v. NCAA*, 2025 WL 2017162, at *6 (D. Nev. July 18, 2025).

Ultimately, beyond its plea to "common sense," all the WV AG offers is the same reliance on older case law like *Alston*. (Amicus Br. at 14-15). But as noted above, that reliance is misplaced because "[t]he *Alston* court did not decide the question of market definition." *Fourqurean v. NCAA*, 143 F.4th 859, 870 (7th Cir. 2025); *see also Elad* at *5 (rejecting the district court's relevant market finding due to its reliance on "market realities predating the Supreme Court's decision in [Alston]."[7] In short, the WV AG's brief adds rhetoric, but no additional substance, on the issue of market definition.

### III. Appellees Have Failed to Respond to the Evidence Disproving the District Court's Finding of Anticompetitive Effects.

Appellees attempt to support the District Court's finding that the Five-Year Rule is anticompetitive begins by misrepresenting the NCAA's arguments. The NCAA's opening brief noted that the District Court's determination that "the exclusion of a class of otherwise qualified athletes creates a substantial anticompetitive effect" (Opening Br. at 39) lacks a limiting principle and would eliminate all eligibility rules if applied rigorously. *Id*. Appellees' contention that this language constitutes an "admi[ssion] that the very purpose of the [Five-Year Rule]

---

[7] The WV AG contends that the "evidentiary threshold" required at the preliminary-injunction stage is "very limited." (Amicus Br. at 16.) This contention fails to overcome the absence of evidence supporting the District Court's relevant market finding below. Appellees' burden was greater than zero, and they failed to provide *any* credible evidence supporting their proposed relevant market.

is to exclude student-athletes from the college sports labor market" is a mischaracterization of the NCAA's argument. The question is not whether an eligibility rule excludes some student-athletes from the claimed market; by definition, "any eligibility rule will ... reduce the pool of participating players to those who are eligible and exclude those who are ineligible." *Id*. The question is whether that exclusion amounts to a substantial anticompetitive effect.

The NCAA's opening brief includes a detailed explanation of the errors in the District Court's finding that the Five-Year Rule is anticompetitive. (Opening Br. at 32-41.) The District Court determined Appellees had a likelihood of success on the merits of their antitrust claim despite their failure to establish that the Five-Year Rule reduces the total benefits, the quality of benefits, or the total number of competitive opportunities student-athletes receive from schools. *Id*. at 33. They also failed to provide evidence that Division I institutions have a recruiting advantage over junior colleges, or that the Five-Year Rule deters players from choosing to attend a JUCO institution prior to competing in Division I. *Id*. at 33-34. Although Appellees' Response contend the record is "replete" with evidence that the Five-Year Rule is anticompetitive, (Response Br. at 21) it fails to identify this evidence or otherwise respond to the NCAA's arguments.

Appellees first ask the Court to consider the textbook chapter discussed in Section II above. This authority is not evidence that the Five-Year Rule is

anticompetitive because, as Appellees acknowledge, it does not reference or discuss the Five-Year Rule. (Response Br. at 22.) The alleged collusion discussed in the chapter involves "placing a ceiling on the number of scholarships that a school may award in each sport" and limiting student-athlete compensation. (JA514.) Appellees make no attempt to explain how this alleged collusion provides evidence that supports the injunction issued below.

Appellees further rely on Dr. Maxcy's expert report. (Response Br. at 23). This report is not competent evidence of any harm to competition because Dr. Maxcy fails to cite any facts or data showing that JUCOs compete against Division I schools or that the Five-Year Rule harms competition.[8]

The *amicus* brief adopts Appellees' argument that the Five-Year Rule reduces competition by excluding athletes from the market. (Response Br. at 20.) Because this conclusion is supported solely by a citation to NCAA Bylaws and to a 1992 decision by the Seventh Circuit dismissing a student-athlete's antitrust claim on grounds that he failed to allege an anticompetitive impact in a discernable antitrust market, it fails to provide evidence supporting the District Court's issuance of the injunction below. *Id*.; *Banks v. NCAA*, 977 F.2d 1081, 1098 (7th Cir. 1992).

---

[8] As discussed above, the Third Circuit rejected Dr. Maxcy's report pursuant to his failure to provide facts or date to support his proposed market definition. His report similarly lacks evidence of the Five-Year Rule's alleged anticompetitive effects.

The WV AG further argues that "the NCAA's premature exclusion of former JUCO athletes comes close to a group boycott—which are often per se illegal under the Sherman Act." (Response Br. at 20.) However, Appellees did not allege a group boycott claim and the District Court made no findings regarding such a claim. Similarly, the record is devoid of any evidence of a wage effect, *id.* at 21, and the District Court did not rely on such an effect below.

Appellees' failure to provide evidence of any anticompetitive effects is particularly acute following the final approval of the settlement in the *House* litigation. *See House v. NCAA*, No. 4:20-cv-03919, 2025 WL 1675820 (N.D. Cal. June 6, 2025). Appellees' burden was to show harm to competition, not just to themselves. *See Loren Data Corp. v. GXS, Inc.*, 501 F. App'x 275, 282 (4th Cir. 2012). Because the *House* settlement establishes a cap on benefits that NCAA member institutions can provide players each year, as well as establishing limits on the sizes of rosters, Appellees cannot claim that the Five-Year Rule results in a reduction in compensation provided to student-athletes. *See House* 2025 WL 167820, at *7. Whether otherwise ineligible players like Appellees are permitted another year of competition will only impact who receives available compensation, not the overall level of compensation available to student-athletes.

Similarly, Appellees cannot claim that the Five-Year Rule reduces the size of the labor pool. As a result of roster limits authorized by the *House* settlement, each

roster spot Appellees fill will displace other student-athletes if Appellees are provided additional years in which to compete. Consequently, Appellees did not and cannot meet their burden of showing market-wide harm to competition. *See Ohio v. Am. Express*, 585 U.S. 529, 542 (observing that evidence of anticompetitive effects would include evidence of "reduced output, increased prices, or decreased quality in the relevant market").

## IV. Appellees Ignore the NCAA's Procompetitive Justifications.

The NCAA's opening brief identifies several procompetitive justifications for the Five-Year Rule. (Opening Br. at 42-43; *see supra* at 2-3.) Appellees do not address these justifications or otherwise "demonstrate that the [NCAA's] procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Ohio v. Am. Express. Co.*, 585 U.S. at 541. Instead, they make additional, unsupported arguments regarding the alleged anticompetitive effects of the rule. (Response Br. at 25.)

Appellees instead dodge the issue, contending that the *Pavia* waiver is a "tacit admission that there is no rational or procompetitive basis for the NCAA's JuCo penalty." *Id*. This contention is both false and irrelevant to Appellee's burden to respond to the NCAA's procompetitive justifications with evidence that they can be achieved through less anticompetitive means. The NCAA's issuance of the waiver ensured horizontal equity for similarly situated student-athletes during the *Pavia*

appeal. Appellees make no effort to explain how a measure that ensured equal opportunities for these student-athletes is an admission that the Five-Year Rule is unsound, particularly when the NCAA continues to defend the rule and has brought forth procompetitive justifications recognized by other courts.[9]

The WV AG's brief adds nothing on this score either. Contrary to their claim, Am. Br. 25, the NCAA has not abandoned any of its procompetitive justifications— the Five-Year Rule ensures that college sports are played by a shifting group of students pursuing degrees rather than older student-athletes seeking even more training or compensation; expands output (and the quality of output) by ensuring new high-school students can enter college sports every year, and better aligns academics and athletics by trying eligibility to the timeframe needed to obtain a four-year college degree.

While the *amicus* claims that the Five-Year Rule is not necessary to achieve those goals, it offers no evidence undermining the NCAA's argument, but simply suggest that the lines could be drawn in a better place. But that is the precise type of central planning condemned by *Alston*. On this issue, *Alston* was perfectly clear: "courts should not second guess degrees of reasonable necessity so that the

---

[9] Appellees contend that the NCAA "points to findings from other cases" in lieu of providing evidence of procompetitive effects. (Response Br. at 26-27.) This contention is curious in light of Appellees' failure to respond to the NCAA's arguments.

lawfulness of conduct turns upon judgments of degrees of efficiency," because allowing such second-guessing "would be a recipe for disaster." *Alston*, 594 U.S. at 98 (quotations omitted). "To know that the Sherman Act prohibits only *unreasonable* restraints of trade is thus to know that attempts to meter small deviations is not an appropriate antitrust function." *Id.*; *see also Pavia*, 154 F.4th at 418 (Thapar, J., concurring) (quoting *Alston*, 594 U.S. at 103) (Judges "aren't good 'central planners and should never aspire to the role.'").

In short, it is no answer to the NCAA's procompetitive justifications to assert that there might be another way to achieve them—particularly when the suggestion made is contrary to the considered judgment of the institutions of higher education that passed the rules, and would run the risk of harming incoming high-school students for whom college sports may provide the only pathway to obtaining a college degree.

## V. Appellees Provide No Explanation For Their Failure to Timely File Suit.

The NCAA's opening brief established that Appellees inordinately delayed seeking injunctive relief and therefore cannot make the required showing of irreparable harm. (Opening Br. at 44.) Despite knowing for several years that their eligibility would expire at the conclusion of the 2024 football season, Appellees waited until mere weeks before the start of the 2025 football season to seek

injunctive relief. *Id*. In doing so, Appellees created the emergency that served as the basis for their request for emergency relief.

That Appellees were aware that their eligibility expired no later than December 2024 is undisputed. (Response Br. at 29.) At the outset of their athletic careers, they were required to sign an acknowledgment that they were "responsible for knowing and understanding the application of all NCAA Division I regulations related to [their] eligibility." (JA655.) Despite their awareness of the Five-Year Rule—and corresponding expiration of their eligibility—over their entire playing careers, Appellees filed suit **seven months** after the expiration of their eligibility in December of 2024.

None of Appellees' responses change this straightforward reality. First, Appellees contend the Pavia waiver issued in December of 2024 is an "intervening and fundamental shifts in college sports" that prevented them from timely filing suit. (Response Br. at 29.)

But Appellees make no effort to explain how the NCAA's issuance of the Pavia waiver necessitated or explains their failure to timely file suit. Appellees' brief does not reproduce language from the *Pavia* waiver or otherwise explain its significance regarding their claim of irreparable harm, and it is clear from its terms that the *Pavia* waiver did not apply to Appellees.

Appellees likewise erroneously claim that the announced settlement of *House v. NCAA* in June of 2025 is another major shift that excuses their delay. But once again, Appellees provide no explanation of how the *House* settlement necessitated or explains their delay in filing suit. (Response Br. at 29.) Appellees' isolated reference to the *House* settlement, without citation or analysis, necessarily fails to provide the court with any evidence that excuses Appellees' delay.

Finally, two Appellees contend that their delay is excusable because they "were still attempting to utilize the NCAA's internal administrative processes up until June [and] August 8, 2025." *Id*. at 29. This argument fails. As an initial matter, Appellees' pursuit of waivers to extend their eligibility does not excuse their extended delay in filing suit. Appellees make no attempt to explain their failure to pursue the waivers before their eligibility expired. They do not identify language in any NCAA Bylaw or legal principle that required them to pursue the waivers in lieu of timely filing suit. Indeed, Appellees could have submitted the waivers at any time over their extended playing careers.[10]

Moreover, the notion that any Appellee was required to wait for the final conclusion of a waiver request before filing suit is directly disproven by the record.

_____

[10] Notably, neither Appellees' complaint nor their motion for preliminary injunction attached their waiver requests identified when the waivers were submitted or when they were resolved. The only evidence in the record regarding the waiver requests is the response of counsel for the NCAA to a question posed by the District Court during the preliminary injunction hearing. (JA1196.)

Appellees filed suit on August 1, 2025, one full week before one Appellee received a final decision on his waiver request on August 8, 2025. *Id.* (JA6; 1196.) If one Appellee could file suit before the conclusion of a waiver request, he and the other Appellees have no excuse for their failure to timely pursue waivers or file suit. Moreover, the record is devoid of any evidence that excuses Appellee Robinson's delay. His waiver request concluded on February 27, 2025—over five months before he filed suit.[11]

## CONCLUSION

Because the District Court erred in finding a likelihood of success on the merits, irreparable harm, or that the balance of equities is in Appellees' favor, the District Court's order awarding a preliminary injunction should be reversed.

Dated: December 15, 2025.

Respectfully submitted,

By: */s/ Nishma Patel*
**Thomas R. Woodrow**
NC Bar No. 58622
**Nishma Patel**
NC Bar No. 50922
**HOLLAND & KNIGHT LLP**
1120 S. Tryon Street, Suite 900

---

[11] Appellees further attempt to excuse their delay by speculating that the NCAA would have challenged a timely suit by claiming it was not ripe. (Response Br. at 29.) This speculation does not excuse Appellees' delay. Although numerous student-athletes have sought to enjoin the Five-Year Rule since *Pavia*, Appellees have not identified any who faced a ripeness defense based on the timing of their waiver requests because the NCAA has not interposed the defense in any of these cases.

Charlotte, North Carolina 28203
Phone 980.215.7797
Fax 980.215.7771
tom.woodrow@hklaw.com
nishma.patel@hklaw.com

**J. Douglas Minor, Jr.**
**HOLLAND & KNIGHT LLP**
1180 West Peachtree Street, NW
Suite 1800
Atlanta, Georgia 30309
(404) 817-8500 (phone)
(404) 881-0470 (fax)
doug.minor@hklaw.com

**Benjamin L. Bailey (WVSB No. 200)**
**Christopher D. Smith (WVSB No. 13050)**
**BAILEY & GLASSER, LLP**
209 Capitol Street
Charleston, West Virginia 25301
(304) 345-6555 (phone)
(304) 342-1110 (fax)
bbailey@baileyglasser.com
csmith@baileyglasser.com

*Counsel for National Collegiate Athletic*
*Association*

# COMBINED CERTIFICATIONS

I certify that:

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). This brief contains 5,171 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.

2.      This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because it has been prepared in a 14-point proportionally spaced typeface (Times New Roman) using Microsoft Word.

3.      On December 15, 2025, I caused the foregoing to be filed with the Clerk of Court using the CM/ECF System.

Date: December 15, 2025

*/s/ Nishma Patel*
Nishma Patel
